AMERICAN JEWISH CONGRESS; Eve Slaff; Alan Sieroty; Devera Lurie Waldman; Charles Waldman, Plaintiffs–Appellants,

v.

CITY OF BEVERLY HILLS; Allan L. Alexander, Mayor; Bernard J. Hecht; Robert K. Tanenbaum; Maxwell H. Salter; Vicki Reynolds, Defendants–Appellees,

and

Chabad of California, Inc., Defendant–Intervenor–Appellee.

No. 93–55085.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 21, 1996.

Decided July 19, 1996.

Carol A. Sobel, ACLU Foundation of Southern California, Los Angeles, California, and Douglas E. Mirell, Los Angeles, California, for plaintiffs-appellants.

Harry L. Gershon, Richards, Watson & Gershon, Los Angeles, California, for defendants-appellees.

Jeffrey G. Kichaven, Alschuler, Grossman & Pines, Los Angeles, California, for defendant-intervenor-appellee.

Tzivia Schwartz, Anti–Defamation League, Los Angeles, California, for amicus curiae.

Before: HUG, Chief Judge,
SCHROEDER, FLETCHER, CANBY,
BEEZER, HALL, WIGGINS, BRUNETTI,
FERNANDEZ, T.G. NELSON, and
TASHIMA, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiffs-appellants, the American Jewish Congress and individual members (collectively "American Jewish Congress"), challenge under the religion clauses of the United States and California constitutions the action of defendants-appellees, the City of Beverly Hills and individual officials (collectively "the City" or "Beverly Hills") in permitting defendant-intervenor-appellee Chabad of California, Inc. ("Chabad") to erect a 27–foot menorah in a public park near City Hall during the holiday season. The American Jewish Congress claims that the City's policy and practice of permitting unattended displays of large objects on public property, pursuant to which Chabad was granted permission to erect the menorah, is unconstitutional. The district court granted summary judgment in favor of the City. A three-judge panel of this court reversed. 65 F.3d 1539 (9th Cir.1995). The court then voted to rehear the case en banc. We now withdraw the panel opinion, reverse the district court's grant of summary judgment, and remand for entry of judgment in favor of the American Jewish Congress.

## I

Since 1986, Beverly Hills has allowed Chabad to erect a menorah in Beverly Gardens Park for approximately two weeks each year during the Chanukah season. The menorah is 27 feet tall and 24 feet wide, and weighs 5,500 pounds. It is bolted to a permanent, concrete foundation that the City allowed Chabad to install in the park; Chabad covers the foundation with sod during the rest of the year. Each branch of the menorah is topped with a small electric light lit at night in accord with Jewish custom. The menorah was designed by Yaacov Agam, a well-known artist. The City does not fund the menorah or Chabad.

Beverly Gardens Park is a twenty-block-long public park that cuts through the City on an east-west axis. The park is bordered on its south side by Santa Monica Boulevard, a four-lane arterial. The menorah sits on a block of the park bordered on the east by Crescent Drive and on the west by Canon Drive. Directly across Santa Monica Boulevard from the menorah is a building that formerly housed the U.S. Post Office and has been vacant since the early stages of this litigation. City Hall is one block up and one block over from the menorah, about 450 feet distant. The Beverly Hills Civic Center is located on the side of City Hall facing away from the menorah.

The City traditionally puts up a holiday display of its own, composed of two 35–foot live spruce trees strung with colored lights, and a 60–foot gold-foil "Season's Greetings" sign. This display is located one block west of the menorah, two blocks away from City Hall.

During Chanukah, Chabad organizes ceremonies centered around the menorah. Chabad terms these ceremonies "parties," but they involve the ritual lighting of the electric "candles" and the speaking and singing of traditional Jewish prayers. Members of the City Council (which is also the body that approves the menorah's permit) have participated in these ceremonies each year, and

some of them have served as "master of ceremonies." Local celebrities, of which Beverly Hills has no shortage, also attend. The current mayor was present on at least one occasion.[1]

The City has a general policy of not permitting its citizens to erect large unattended objects on public property. It has made an exception for Chabad's display of a menorah during Chanukah. The City has a "Special Events Permit" application procedure and a form agreement titled "Holiday Installation of Religious Objects on City Property." Chabad has successfully applied for a special events permit and has signed a "Holiday Installation" agreement each year. At least since 1986, the City has not granted a permit for a large unattended object to any individual or organization other than Chabad. In 1989, the City denied two permit requests from individuals: one for a "winter solstice" display, and one for a Latin cross. The City claimed that both applications were simply protests against the menorah,[2] and that it denied them because neither provided sufficient detail concerning their proposed display.

In 1990, the American Jewish Congress filed a complaint in federal district court, alleging that the City's action in permitting Chabad's menorah violated the Establishment Clause of the United States Constitution. After a hearing, the district court issued a temporary restraining order that required the City either to place the menorah in closer proximity to a Christmas tree or to put up a Christmas tree near the menorah. Thereafter, the City put Christmas decorations and lights on an 80–foot spruce tree standing 82 feet from the menorah. Also pursuant to the restraining order, Chabad erected a sign next to the menorah, which reads,

THIS MENORAH IS SPONSORED BY CHABAD OF CALIFORNIA. IT IS NOT SPONSORED OR FUNDED BY THE CITY OF BEVERLY HILLS.

The sign faces busy Santa Monica Boulevard, parallel to the roadway. The parties dispute whether it can be read from a moving car. The district court also enjoined "any religious ceremonies, including, but not limited to, prayers, blessings, singing or rituals, of any type or nature at the site of the display." District Court Order of December 13, 1990 at 3. The TRO was dissolved on December 21, 1990, however, when the court decided that a preliminary injunction should be denied.

On December 3, 1992, the court denied the American Jewish Congress's motion for summary judgment, and granted, *sua sponte,* summary judgment in favor of the City. The court stated neither the legal justification for its ruling nor the uncontroverted facts on which it was based. It simply held that the City could continue to permit Chabad to display the menorah, provided that it was in close proximity to a Christmas tree of similar size and that if either was lighted, both must be lighted. It also ordered that the "disclaimer" sign facing Santa Monica Boulevard be altered so that it could be read from the opposite direction as well. The order was silent as to whether Chabad was allowed to continue holding Chanukah candle-lighting ceremonies at the menorah.

## II

### A.

■ Appellees do not question the American Jewish Congress's standing to challenge the City's action in permitting Chabad's menorah, which derives from its claim that the City's alleged establishment of religion interferes with its members' rights freely to use and enjoy Beverly Gardens Park. *See Kreis-*

---

1. In contrast, the former mayor of Beverly Hills was strongly opposed to the ceremonies, which he called "distinctly religious." "Beverly Hills Under Fire for Allowing Menorah Rite," *Los Angeles Times,* Jan. 11, 1987, pt. 9, at 1; *see also* "Religious Symbols: 'Tis the Season for Contention," *Los Angeles Times,* Dec. 22, 1987, pt. 2, at 1.

2. The winter solstice display application began, "I note that once again the City of Beverly Hills will permit the display of a Jewish menorah, in observation of Chanukah. I hereby apply for equal time and space...."

*ner v. City of San Diego,* 1 F.3d 775, 778 n. 1 (9th Cir.1993) (under federal Constitution), *cert. denied,* 510 U.S. 1044, 114 S.Ct. 690, 126 L.Ed.2d 657 (1994); *Ellis v. City of La Mesa,* 990 F.2d 1518, 1523–24 (9th Cir.1993) (under California Constitution), *cert. denied,* —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994). Appellees argue, however, that the American Jewish Congress lacks standing to challenge the City's special events permitting scheme, because neither the American Jewish Congress nor its individual members have attempted, or plan to attempt, to apply for a special events permit.

Appellees wrongly view the American Jewish Congress's challenge to the City's permitting scheme as purely a "prior restraint" claim brought under the Free Speech Clause of the First Amendment. The American Jewish Congress's challenge to the City's permitting scheme sounds in its right to be free from governmental establishment of religion. The American Jewish Congress contends that the primary effect of the City's permitting practice and policy is not to grant equal access to all speakers, but rather to endorse one particular religious speaker. It contends that the City permitted Chabad to erect its menorah pursuant to such an unconstitutional policy. Whether the American Jewish Congress has sought or will seek to secure a special event permit for itself is irrelevant to its standing to bring this claim. Rather, it need only allege that, by allowing the erection of Chabad's menorah, the City's permitting scheme interferes with its right freely to use and enjoy the park. *See Kreisner,* 1 F.3d at 778 n. 1, 787 (holding that plaintiff "has standing to bring this action based on his allegation that the challenged display interferes with his right to use Balboa Park" and addressing merits of plaintiff's claim that city's permitting scheme gave preference to private religious group sponsoring holiday display and thus violated Establishment Clause); *Hewitt v. Joyner,* 940 F.2d 1561, 1564 (9th Cir.1991) (concluding that plaintiffs have standing to challenge under the Establishment Clause county's ownership and maintenance of park containing religious statuary where plaintiffs are thereby restrained in their right freely to use park), *cert. denied,* 502 U.S. 1073, 112 S.Ct.

969, 117 L.Ed.2d 134 (1992); *Doe v. Small,* 964 F.2d 611, 619 (7th Cir.1992) (en banc) (addressing merits of plaintiff's Establishment Clause challenge to city's permitting scheme).

### B.

We review de novo the district court's grant of summary judgment in favor of the City and view the evidence in the light most favorable to the American Jewish Congress. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). In determining whether the district court should have granted summary judgment in favor of the American Jewish Congress, we view the evidence in the light most favorable to the City.

### C.

The American Jewish Congress asserts that the City's action in permitting Chabad's menorah violates the Establishment Clause of the United States Constitution, the Establishment Clause of the California Constitution (art. I, section 4), the No Preference Clause of the California Constitution (art. I, section 4), and article XVI, section 5 of the California Constitution.

The Establishment Clause of the California Constitution, in "language virtually identical to the Establishment Clause of the First Amendment," provides that " '[t]he Legislature shall make no law respecting an establishment of religion.' " *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1395 (9th Cir.) (quoting Cal. Const. art. I, § 4), *cert. denied,* —— U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994). The California Supreme Court has stated that "cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution." *Raven v. Deukmejian,* 52 Cal.3d 336, 276 Cal.Rptr. 326, 337, 801 P.2d 1077, 1088 (1990) (citation and internal quotation marks omitted). We are aware of no California case construing the state Establishment Clause differently, in any way relevant to this case, from its "virtually iden-

tical" federal counterpart. *See Vernon,* 27 F.3d at 1395; *cf. Sands v. Morongo Unified Sch. Dist.,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 45, 809 P.2d 809, 820 (1991) (determining that government endorsement of school graduation prayers violates federal Establishment Clause, and holding without further analysis that this practice also violates Establishment Clause of California Constitution), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992). Accordingly, we "resolve both the state and federal constitutional claims in our discussion of the scope of the federal constitutional right." *Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 705 n. 4 (9th Cir.1992).

### D.

■ The American Jewish Congress contends that the City forbids the erection of large unattended displays on public property and then vests standardless discretion in its officials to grant exceptions to the rule, enabling the City to favor certain religious expression over other expression. The American Jewish Congress contends that the City permitted Chabad to erect the menorah pursuant to such a policy and practice, in violation of the Establishment Clause. We agree.[3]

The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The United States Supreme Court has interpreted the Establishment Clause to mean that

> government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*County of Allegheny v. ACLU,* 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989) [hereinafter *"Allegheny County"*] (footnotes omitted). At core is "the prohibition against governmental endorsement of religion 'preclud[ing] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred.'"* *Id.* at 593, 109 S.Ct. at 3101 (quoting *Wallace v. Jaffree,* 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in the judgment)) (emphasis in original). Chabad's placement of the menorah in Beverly Gardens Park is private religious expression. *See Allegheny County,* 492 U.S. at 613, 109 S.Ct. at 3111 (menorah is religious symbol).

■ It is axiomatic that the Establishment Clause bars the government from giving sectarian religious groups preferential access to public property. As a plurality of the Court stated in *Capitol Square,*

> Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause (as well as the Free Speech Clause, since it would involve content discrimination). And one can conceive of a case in which a governmental entity manipulates its administration of a public forum close to the seat of government ... in such a manner that only certain religious groups take advantage of it, creating an impression of endorsement *that is in fact accurate.*

*Capitol Square Review Advisory Bd. v. Pinette,* —— U.S. ——, ——–——, 115 S.Ct. 2440, 2448–49, 132 L.Ed.2d 650 (1995) [hereinafter *"Capitol Square"*] (plurality opinion) (emphasis in original); *see also id.* at ——, 115 S.Ct. at 2454 (O'Connor, J., concurring) (agreeing that the Establishment Clause prohibits government favoritism); *Allegheny County,* 492 U.S. at 599–600, 109 S.Ct. at 3104–05 (county impermissibly favored sectarian religious speech by giving it preferen-

---

**3.** The American Jewish Congress also contends that the Establishment Clause is violated because a reasonable observer would identify the City as the menorah's sponsor. Because we find that the City has violated the Establishment Clause by allowing Chabad to erect its menorah pursuant to an ad hoc policy that allows for religious favoritism, we need not address the American Jewish Congress's "reasonable observer" claim.

tial access to the "Grand Staircase" of the county courthouse).

Although Beverly Gardens Park is a "public forum" in that it is a public park where private individuals have broad free speech rights, it is *not* an open forum for large, unattended private structures. The City acknowledges that "the City's general policy is to only allow structures to be placed in the City's parks *by the City*." Informational Notes of City Council Session: Presentation by City Attorney Gregory Stepanicich at 2–3 (Nov. 21, 1989) (emphasis added). "The City's general policy is not to allow private structures to be placed within the City's parks." Letter from City Attorney to Winter Solstice Applicant (Dec. 15, 1989).

■ The City constitutionally could ban all unattended private displays in its parks. *See Capitol Square,* —— U.S. at ——, 115 S.Ct. at 2457 (Souter, J., concurring) ("I also want to note specifically my agreement with the Court's suggestion that the State of Ohio could ban all unattended private displays in Capitol Square if it so desired."). In this case, however, the City has granted an exception to one group. If the City wishes to permit some private unattended displays in its parks, it must do so pursuant to valid time, place, and manner regulations. *See Association of Community Organizations for Reform Now v. Municipality of Golden,* 744 F.2d 739, 746–49 (10th Cir.1984). The City may not have a general policy banning unattended private displays, but, on an ad hoc basis with no standards to guide it, choose one religious group and permit it to erect a display while denying all other groups permission to erect displays. *Cf. Chabad–Lubavitch of Georgia v. Miller,* 5 F.3d 1383, 1386–87 (11th Cir.1993) (en banc) (Chabad's proposal to erect a 15–foot menorah in Capitol's Rotunda did not violate the Establishment Clause where City permitted displays pursuant to a "content-neutral, equal access policy ... on a first-come, first-serve basis to all interested parties" and various other private groups had erected unattended displays, such as an eighteen-foot tall Indian Wattle and Daub Hut and a thirty-five flag exhibit); *Americans United for Separation of Church and State v. City of*

*Grand Rapids,* 980 F.2d 1538, 1541, 1546 (6th Cir.1992) (en banc) (Chabad's proposal to display a 20–foot menorah in Calder Plaza did not violate the Establishment Clause where City allowed "all parties to have equal access to Calder Plaza" and "[n]o group has ever been denied permission to use the plaza"); *Kreisner,* 1 F.3d at 787–89 (9th Cir. 1993) (private group's display in Balboa Park consisting of scenes from the New Testament did not violate the Establishment Clause where City permitted displays on a first-come, first-served basis regardless of the identity of the speaker or the content of the speech).

Beverly Hills' permitting process has no clear standards for allowing private unattended displays in its parks and thus allows for arbitrary application. The City bans private unattended displays but permits its officials to make exceptions in their discretion. There are no guidelines, written or otherwise, as to when an exception may be made. Applicants are not informed of what requirements they must meet in order to erect a display. When asked whether there was a uniform procedure for approving requests for unattended displays or whether it was done on a case by case basis, the Director of the City's Public Services Department, responded "case by case. Usually an application form is used, but there are exceptions." Deposition of Richard E. Putnam at 86 (Sept. 22, 1992). "[T]here is no uniform method." *Id.* at 91.

When asked whether there was a specific time frame in which the City required applicants for use of public park land to submit an application, the Director responded, "I don't know of a time frame that has been established," *id.* at 93, although subsequently the City instituted a one-month requirement. Nor is there a time frame within which the City must respond to a permit application. *Cf. Riley v. National Fed'n of the Blind,* 487 U.S. 781, 801–02, 108 S.Ct. 2667, 2680–81, 101 L.Ed.2d 669 (1988) (striking down licensing requirement because it did not set a time limit for action by the government on an applicant's request). Nor is it clear where the decision-making authority is vested. The winter solstice application was denied by the

City Attorney, whereas Chabad's and the Latin cross applications were decided by "consensus" of the City Council members. A council member gave a presentation describing the relative merits of the applications and the Council simply voted whether to allow each display.

Because the City's permitting policy allows for arbitrary application, it is not a valid time, place, and manner regulation. "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992) (quoting *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981)). In the Establishment Clause context, such a regulation also has the potential for impermissibly favoring a particular religious viewpoint.

■ The ad hoc and structureless nature of the City's permitting process leaves open the possibility of improper discrimination by the City.

> [A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.... [W]e have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763–64, 108 S.Ct. 2138, 2147, 100 L.Ed.2d 771 (1988) (striking down city ordinance authorizing the mayor to grant or deny applications for annual permits to publishers to place their newsracks on public property). The City in fact acknowledges that a primary reason the Latin cross application was denied was the Cross's religious nature. The City Attorney testified that the City was concerned that allowing a cross would violate the Establishment Clause whereas allowing a menorah would not. At the City Council session, Councilmember Tanenbaum gave a presentation addressing Chabad and the Latin cross applicant's respective requests to erect displays, listing "several cases where the establishment clause was not violated by the placement of a menorah and not[ing] where the Supreme Court stated that the cross is a religious symbol." Informational Notes of City Council Session at 2 (Nov. 21, 1989). The Council did not discuss the safety or feasibility of the proposed displays but only their religious content. "It was the consensus of Council to uphold the law as interpreted by the state and the federal Supreme Court to approve the placement of the menorah, but to turn down the application for the placement of the cross." *Id.* Such a content-based distinction is impermissible. *See Capitol Square*, ─── U.S. ───, 115 S.Ct. 2440 (invalidating defendants' refusal to allow the Ku Klux Klan to erect a Latin Cross in the Statehouse plaza, which refusal was due to defendants' belief that permitting the cross would violate the Establishment Clause, where other groups were permitted to erect unattended displays, including a menorah, on an equal-access basis). The City also contends that both the Latin Cross and winter solstice applications were "simply a form of citizen protest against the submission of the Chabad application for a permit to erect the menorah during the 1989 season." Stepanicich Decl. at 4 (Nov. 23, 1992). Even if true, this is an impermissible basis for rejecting the applications. Protest speech is fully protected by the First Amendment. *See, e.g., Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 504–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969); *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

Although the City's actions in ruling on Chabad's, the Latin cross, and the winter solstice applications provide strong evidence of favoritism toward Chabad, we need not

determine the City's actual motivation in ruling on the applications or the extent to which its determinations were based on impermissible factors. At the very least, the record makes clear that the City's current ad hoc permitting system is standardless, thereby lending itself to abuse, and that appropriate standards must be developed if the City wishes to allow Chabad, or anyone else, to erect private unattended displays in its parks. "Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. at 758, 108 S.Ct. at 2144. "Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* Here, for example, the City contends that the winter solstice and Latin cross applications were denied because they were insufficiently specific. Since the City does not tell applicants what details they must specify, however, it can always justify an application's refusal by listing a missing detail, making it difficult for the court to determine whether the City is in fact favoring certain speech.

The City has no standards by which it measures requests to allow structures to be erected in its parks by private individuals or groups, "rais[ing] the spectre of selective enforcement on the basis of the content of speech." *NAACP v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir.1984). It forbids the erection of large, unattended displays on public property and then vests unfettered discretion in its officials to grant exceptions to the rule. Permitting the erection of Chabad's menorah pursuant to this policy violates the Establishment Clause of the state and federal Constitutions.

### III

We reverse the district court's grant of summary judgment in favor of the City and remand for entry of judgment in favor of the American Jewish Congress. Because we find a violation of the federal and state Establishment Clauses, we need not address the American Jewish Congress's other state law claims. We grant the American Jewish Congress's request for attorneys' fees on appeal pursuant to 42 U.S.C. § 1988. *See Hewitt*, 940 F.2d at 1571 ("'A prevailing [civil rights] plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'") (alteration in original) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983)). The determination of the amount of the attorneys' fees and their allocation is transferred to the district court. *See* 9th Cir. Rule 39–1.8. Any application for attorneys' fees incurred in the district court should be made in the first instance to the district court.

REVERSED and REMANDED.