Philip K. PAULSON, Plaintiff–Appellant,

v.

CITY OF SAN DIEGO; Mt. Soledad Memorial Association, Inc., Defendant–Appellee.

No. 00–55406.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 2001

Filed Aug. 22, 2001

James E. McElroy, Law Offices of James McElroy, San Diego, California, for the appellant.

Casey G. Gwinn, City Attorney, and Anthony J. Shanley, Deputy City Attorney, San Diego, California, for appellee City of San Diego.

Charles V. Berwanger, Higgs, Fletcher & Mack LLP, San Diego, California, for appellee Mount Soledad Memorial Association.

Before: HUG, DUHE,* and TALLMAN, Circuit Judges.

HUG, Circuit Judge:

We are presented with the issue of whether the presence of a Latin cross on

---

* Honorable John M. Duhe, Jr., Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

private property surrounded by publicly maintained park land atop Mount Soledad in San Diego, California, violates the California and United States Constitutions. The cross sits on land previously owned by the city of San Diego. The district court earlier had issued an injunction against the cross's presence on publicly owned land for violation of the No Preference Clause of the California Constitution. The city subsequently sold a half acre parcel beneath the cross through a publicized and open bidding process. The district court found this sale sufficient to cure the constitutionally impermissible appearance of preference for religion by the city. We agree with the district court and AFFIRM its decision denying as moot Appellant's motion to enforce the previous injunction.

## I. BACKGROUND

Mount Soledad Natural Park is approximately 170 acres of land forming a mountain with a flat cleared area at the top. The flat portion has a driveway and parking area which encircles a relatively small area of land with a 43 foot high cross. Since 1913, a cross has stood in the area where the Mt. Soledad cross now stands. After a wind storm destroyed the then existing cross in 1952, the city council granted permission to the Mt. Soledad Memorial Association (the Association) to place another cross on Mt. Soledad. In 1954, the current cross was dedicated to veterans of World Wars .I & II and the Korean War.

Immediately outside the parking area surrounding the cross is a cleared area with benches and a public sidewalk. The cross is visible from various places in the park and around the city including a portion of the interstate highway. The cross has been the subject of litigation for approximately ten years. A more complete history of the events involved in the previous litigation is set forth in our decision in *Ellis v. City of LaMesa,* 990 F.2d 1518,

1527 (9th Cir.1993). Thus, we present a summary here as it pertains to the instant decision.

In December 1991, the district court ruled that the presence of the cross on publicly owned land in Mount Soledad Park violated the No Preference Clause of the California Constitution. *Murphy v. Bilbray,* 782 F.Supp. 1420, 1438 (S.D.Cal. 1991), *aff'd,* 990 F.2d 1518 (9th Cir.1993). The court issued a permanent injunction forbidding the permanent presence of the cross on publicly owned land. On appeal, we affirmed the injunction, holding that the mere designation of the cross as a war memorial was not enough to satisfy the separationist No Preference Clause of the California Constitution. *Ellis,* 990 F.2d at 1528. In response to the injunction, the city sold approximately 222 square feet under the cross to the Association in a negotiated sale for fair market value. At that time, the city did not solicit or consider any bids or offers from other prospective buyers of this land and the Association clearly stated its intention to keep the cross as part of its proposed war memorial.

In September 1997, the district court ruled that both the method of sale and the amount of land sold failed to remedy the original constitutional infirmities. *See Murphy v. Bilbray,* 1997 WL 754604 (S.D.Cal. Sept.18, 1997). Although the court found that the negotiated sale complied with requirements under the city's Charter and Council Policy, it also found the method of sale unconstitutional. Because the city sold the land to the Association in a private negotiated sale without considering any other offers or bids, the sale gave the appearance that the city was preferring the Christian religion by trying to save the cross. Also, the city sold only a tiny plot of land, 222 square feet, directly under the cross while the remaining developed land surrounding the cross was still

owned and maintained by the city. The court found that the method of sale made apparent that the city's primary purpose for the sale was to preserve the cross.

The negotiated sale with the Association did not allow any other entity the opportunity to buy the plot of land underneath the cross. The district court emphasized that it was this exclusion of any other purchasers of or bidders for the land that gave the appearance of preferring the Christian religion over all others. Additionally, the court found that under those circumstances most visitors would not be aware that the city did not own and maintain the cross and, thus, the city had not remedied the appearance of preference for religion.

In July 1998, the city sold .509 acre of land (approximately 22,172 square feet) underneath the cross. The sale was a well publicized open bidding process and resulted in the land being sold to the Association for $106,000, which was the highest bid.[1] Philip Paulson brought a motion to enforce the injunction against the presence of the cross arguing that the recent sale did not cure the constitutional problems. Specifically, Paulson contends that the city structured the bidding process to favor the Association in a continued effort to save the cross and that the parcel sold was still too small to alleviate the appearance of preference for religion.

The district court found the sale constitutional and concluded that the method of sale, amount of land sold, and the proposed improvements divested the city of any appearance of preference for religion. As discussed below, the Association presented plans for significant improvements to the memorial including erecting twenty-six concrete bollards, placing one every twenty feet, surrounding the memorial site with a plaque between each bollard stating "Mount Soledad Veterans' Memorial—Private Property." Accordingly, the district court denied as moot the motion to enforce the injunction. Paulson timely appealed.

## II. ANALYSIS

■■■ The district court's refusal to grant a motion to enforce an injunction is tantamount to a denial of injunctive relief. *Herrington v. County of Sonoma*, 12 F.3d 901, 907 (9th Cir.1993). We will reverse such a decision only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id.* at 907–908. We review de novo the district court's interpretation of state law. *See A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 335 (9th Cir.1996).

■■■ The California constitution guarantees the "free exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4. This provision, referred to as the No Preference Clause, prohibits not only actual preference but also any appearance that the government has allied itself with one specific religion.[2] *Sands v. Morongo Unified*

---

1. St. Vincent de Paul Management made a bid of either $50,000 or, in the alternative, $5,000 more than the highest bidder. The committee treated the bid as a simple $50,000 offer because permitting a bid computed by reference to another bid would render the bidding process meaningless.

2. Another provision of the state constitution, Article XVI, section 5, strictly prohibits any governmental support for religious purposes. The California Supreme Court has interpret-

ed this provision to ban any form of governmental involvement "which has the direct, immediate, and substantial effect of promoting religious purposes." *California Educ. Facilities Auth. v. Priest*, 12 Cal.3d 593, 606 n. 12, 116 Cal.Rptr. 361, 526 P.2d 513 (1974). Paulson has failed to establish a violation of this provision. As discussed below, the sale and transfer of land here do not have a direct, immediate and substantial effect of promoting religion.

*Sch. Dist.,* 53 Cal.3d 863, 876, 281 Cal. Rptr. 34, 809 P.2d 809 (1991); *Hewitt v. Joyner,* 940 F.2d 1561, 1567 (9th Cir.1991). This parallels the guarantee of the Establishment Clause of the United States Constitution, which "prohibits the government from appearing to take a position on questions of religious belief." *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

■ Although some California courts have interpreted the No Preference Clause as being more protective of the principle of separation than the federal guarantee,[3] the California Supreme Court has recently suggested otherwise. *Compare Okrand v. City of Los Angeles,* 207 Cal.App.3d 566, 254 Cal.Rptr. 913, 916 (1989) *with East Bay Asian Local Development Corp. v. State of California,* 24 Cal.4th 693, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000).[4] The California Supreme Court concluded that it was not necessary to construe the No Preference Clause of the California Constitution because the government action satisfied the *Lemon* test,[5] which is applied to challenges under the Establishment

Clause of the United States Constitution and, thus, was neither a governmental preference for or discrimination against religion. *Id.* at 719, 102 Cal.Rptr.2d at 299, 13 P.3d at 1139.[6] This suggests that the United States Constitutional standard is either equally restrictive or more restrictive than the No Preference Clause of the California Constitution.

Paulson challenges the district court's decision on two grounds. First, he objects to the method of sale, asserting that the city structured the bidding process to give the Association an advantage. Second, he contends that the amount of land sold to the Association is insufficient to eliminate an appearance· of preference for religion by the city.

### A. The Method of Sale

Paulson argues that the city's sale of the half acre parcel under the cross to the Association demonstrated an unconstitutional preference and aid to the Christian religion. Despite the fact that the most recent sale was conducted in a publicized and open bidding process, Paulson maintains that the city structured the process

3. The district court noted this and reviewed the challenges under the state constitution with this concept of a "Jeffersonian wall of separation between church and state" in mind, avoiding the federal constitutional questions. To the extent there is a difference between the relevant religion clauses of the federal and state constitutions, we conclude that the government action here passes muster under both.

4. Although we recognized this earlier and broader interpretation in *Hewitt,* our opinion in that case pre-dated the California Supreme Court's recent discussion of the state constitution's religion clauses in *East Bay.*

5. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

6. The full statement in the opinion is as follows:

This court has never had occasion to definitively construe the no preference clause of article I, section 4 and we need not do so here. In guaranteeing free exercise of religion "without discrimination or preference," the plain language of the clause suggests, however, that the intent is to ensure that free exercise of religion is guaranteed regardless of the nature of the religious belief professed, and that the state neither favor nor discriminate against religion. Having concluded above that an exemption from a landmark preservation law satisfies all prongs of the Lemon test, it follows that the exemption is neither a governmental preference for or discrimination against religion.
*East Bay,* 24 Cal.4th at 719, 102 Cal.Rptr.2d 280, 13 P.3d 1122.

to give the Association an advantage by requiring maintenance of a war memorial on the property and considering the bidders' experience in maintaining a war memorial. Paulson further argues that it was improper for the city to retain complete discretion to accept or reject any bid for any reason.

The city's invitation for purchase proposals solicited non-profit corporations interested in purchasing approximately one-half acre of property in the Mount Soledad Natural Park for the purpose of maintaining an historic war memorial. The invitation stated that the city was neither requiring nor precluding the retention of the cross. The invitation requested that proposals include a detailed outline for the maintenance of an historic war memorial.[7]

As the district court noted, the bidding process was open and publicized. The city received 42 requests for copies of the invitation and five serious proposals. The proposals were submitted by Horizon Christian Fellowship, the National League for the Separation of Church and State, Saint Vincent De Paul Management, Freedom From Religion Foundation, and the Association. The city established a committee and evaluation criteria. Of the five bids received, the Association's bid price of $106,000 was the highest.

■ Paulson does not challenge the continued use of the site as a war memorial.

Rather, he argues that this use restriction favored the Association in the bidding process. The open and public bidding process, which could have resulted in a sale of the property to someone who would have removed the cross, makes a strong showing of the government's lack of preference of religion in imposing the use restriction. Imposing the use restriction here that requires that the property be used as it has in the past—as a war memorial—does not conflict with the Establishment Clause. *See Freedom From Religion Foundation v. City of Marshfield,* 203 F.3d 487, 491 (7th Cir.2000) (en banc) (upholding use restriction that public property containing statue of Christ sold to private organization be maintained as a public park).

■ Paulson also contends that the consideration of the bidders' experience in maintaining a war memorial was improper. Our recognition of this use restriction as legitimate compels our conclusion that the consideration of a bidder's qualifications for maintaining a war memorial is not only logical and reasonable, but indeed prudent considering the intended and required function of the property.

Here, the city's sale of the property to the highest bidder did not constitute a preference in evaluation of the bids. *See Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.,* 218 Cal.App.3d 79, 95, 266 Cal.Rptr. 767 (1990). The evi-

7. Paulson faults this use restriction as having been authorized by the voters in 1992 in order to preserve the cross. This argument, however, digresses from the true issue of concern here which is how the most recent sale was actually conducted. Even an observer who is aware of the cross's history on Mount Soledad would recognize that the procedurally neutral sale offered a possibility that a private buyer would remove rather than retain the cross.

These circumstances of a procedurally neutral sale to a private organization differ significantly from those in *Hewitt* which involved continuous county ownership of a park exclusively containing immovable biblical figures and statues of scenes from the New Testament. During the vast majority of the county's ownership of "Desert Christ Park," the park was allowed to appear as an extension of the nearby church, and brochures for the park contained citations to passages in the Bible. *Hewitt,* 940 F.2d at 1569. Paulson's reliance on *Hewitt* is misplaced. There, the county merely attempted to re-characterize the park, rather than divest itself of the religious message with an open sale to a private organization.

dence establishes that religious and secular groups had equal opportunity to purchase the land. Furthermore, a sale of real property generally is an effective way for a public body to end its inappropriate endorsement of religion. *See Freedom From Religion Foundation,* 203 F.3d at 491 (upholding closed sale to private organization because it complied with state laws and the city received fair market value for the land).

█ Paulson also challenges the provision of the invitation to bid stating that the city was not obligated to accept any proposal or to negotiate with any proposer and that the city council reserved the right to reject any or all proposals without cause or liability. The district court noted that all invitations for bids sent out by the city for any project contain this same language for liability reasons. Paulson argues that retaining such "unfettered" discretion leaves open the possibility of unconstitutional discrimination by the city. He relies on *American Jewish Congress v. City of Beverly Hills,* 90 F.3d 379 (9th Cir.1996) (en banc).

In *American Jewish Congress,* we held that the city of Beverly Hills' ad hoc permitting system lent itself to abuse such that the city's decision to allow the erection of a menorah in a public park violated the Establishment Clauses of the California and Federal Constitutions. The permitting process in *American Jewish Congress* involved a general rule forbidding the erection of large unattended displays on public property but vested standardless discretion in its officials to grant exceptions to the rule. *Id.* at 383. There were no guidelines as to when an exception could be made, applicants were not informed of what requirements they had to meet to erect a display and sometimes application forms were not even used. *Id.* at 384. Moreover, it was not even clear where the decision-making authority was

vested. *Id.* Such truly absolute discretion without any standards is clearly distinguished from the city council's discretion here.

Paulson does not dispute that this discretion is retained in all bid invitations to avoid liability. Indeed, the city has explained that the invitation to bid was prepared, evaluated, and awarded according to well-established, written city procedures which mandate the inclusion of a provision permitting the city to reject any bid.

The bidding process was structured with explicit factors considered consistently for every bid. The structure of this process did not leave unfettered discretion to the city council and the result of the process here is consistent with the evaluated factors: the Association submitted the highest bid, a detailed proposal to create and maintain a war memorial, and had extensive experience in maintaining such a memorial. Paulson does not contend that the city used its discretion improperly here, but even if he did, the express factors considered provide a reviewable decision unlike the standardless decision in *American Jewish Congress.* Thus, the discretion retained by the city council here does not violate the State or Federal Constitution.

█ The analytical framework developed in *Lemon* provides three factors to be examined to assess whether governmental conduct is constitutionally forbidden under the Establishment Clause: (1) that there is a secular purpose; (2) that the principal or primary effect neither advances nor inhibits religion; and, (3) that an excessive government entanglement with religion is not fostered. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. California has also applied this test to analyze alleged violations of its own constitution's religion clauses. *See East Bay,* 24 Cal.4th 693, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000).

■ Applying the first prong here, the sale had the clearly secular purpose of ending an inappropriate endorsement of religion by transferring the land to a private entity which could retain or remove the cross in its own discretion. As discussed above, the bidding process and the ultimate sale neither preferred or discriminated against religion and, thus, the challenged conduct satisfies the second prong of *Lemon.* Finally, to determine if the state is impermissibly entangled with religious activity under *Lemon* 's third prong, we consider "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105.

■ Here, religious institutions did not necessarily benefit from the sale as they were merely provided the same opportunity as other members of the public in an open bidding process. The state provided no aid as it sought the highest bidder with the best qualifications under the enumerated factors. The only "resulting relationship" from the bidding process is that which existed during the short time that the actual transfer took place. That brief "relationship" which would have necessarily resulted with any sale, did not impermissibly entangle the government with religious activity. We conclude therefore, that the bidding process and the sale itself do not run afoul of the Establishment Clause of the First Amendment or the California Constitution. Having satisfied all prongs of the *Lemon* test, it also follows that the challenged acts were neither governmental preference for or discrimination against religion. *See East Bay,* 24 Cal.4th at 710, 102 Cal.Rptr.2d at 292, 13 P.3d at 1132.

■ Paulson also argues that the resulting transfer of ownership fails the *Lemon* test. The Supreme Court has applied *Lemon* or some variation thereof to cases involving religious displays on government property. *See Allegheny,* 492 U.S. at 592, 109 S.Ct. 3086 (applying *Lemon* to case involving creche and menorah on government property); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (applying *Lemon* to case involving government owned creche). However, this case does not involve a religious symbol that will be maintained on public property, but rather a religious symbol on private property that was sold by the city. The issue on the transfer is the constitutionality of the sale to the private party, which as discussed above, satisfies *Lemon.* With the completion of the valid sale, the land became private property to which *Lemon* does not apply.

■ Because the land was sold in an open bidding process, with its express provision that the purchaser's intent to keep or remove the cross from the property would not be considered in evaluating bids, any appearance of preference for religion is dispelled. While this neutral transaction does sit in the shadow of the city's previous apparent endorsement to save the cross, under the open bidding process, the fact that someone could have bought the property and removed the cross neutralizes this history. Addressing this under the wording of the California Constitution, this process was not structured to "prefer" religion, and the process had sufficient procedural safeguards to not appear to a reasonable observer that the city had allied itself with religion. *See generally Sands,* 53 Cal.3d at 876, 281 Cal.Rptr. at 40, 809 P.2d at 815.

### B. The Location of the Cross & Its Proximity to the Public Park

■ Paulson contends that selling one half acre of land on which the cross is located does not cure the constitutional

infirmity because it is still visible from some areas of the remaining public park land. As the district court noted, this is a 170 acre park most of which is rugged undeveloped open space with some trails and the cross is not even visible from many places within this undeveloped portion of the park. As the district court also noted, it appears that the amount of land sold to the Association includes all the land up to the public sidewalk that encircles the cross. Outside the public sidewalk, there is a circular public driveway, a public parking area and some cleared public land outside the driveway including an area of grass with benches and a water fountain. The cross is visible from the parking area and cleared portions of the park. The important consideration for this cleared area is whether the distinction between the public and private area is clearly marked.

In determining whether a reasonable observer would view the presence of the cross as a governmental preference for religion, the district court considered the Association's preparation of design and construction plans to develop the site as a war memorial. These plans involve erecting twenty-six concrete bollards, one every twenty feet, surrounding the memorial site. Between each bollard will be a plaque stating "Mount Soledad Veterans' Memorial–Private Property." The Association also intends to install additional signs for the publicly owned portion of the park to further identify the memorial site as private property.

■ This enhanced demarcation of the site as private property rectifies any potential appearance of preference for religion. While it is conceivable that an observer from a significant distance could mistake the cross as being part of the public park, once that person reached the memorial site they would quickly recognize that the cross sits on private property. Additionally, the fact that this land is pri-

vate both by its sale and designation, triggers protection of the Association's constitutional rights of Free Exercise and Free Speech. Requiring the removal of the cross from private property would infringe upon the Association's fundamental constitutional rights.

### C. Establishment Clause, Free Exercise and Free Speech

■ There is a crucial distinction between government speech endorsing religion, which the Establishment Clause prohibits, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 765, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). The distinction disappears when private speech can be mistaken for that of the government. Id. at 766, 115 S.Ct. 2440. When such a mistake renders private speech attributable to the government is not clear. In Pinette, a plurality warned that it would have "radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—even reasonably—confuse an incidental benefit to religion with state endorsement." Id. at 768, 115 S.Ct. 2440. The Supreme Court held that the state did not violate the Establishment Clause by permitting a private party to display an unattended cross on the grounds of the state capitol. Three Justices concurred in the judgment, noting that their vote to affirm was in large part because of the possibility of affixing a sign to the cross adequately disclaiming any government endorsement of it. Id. at 784, 115 S.Ct. 2440.

■ Assuming without deciding that Pinette even applies to a religious display on private property, the disclaimers and demarcations that the Association has in-

stalled and planned clearly designate the land and the cross as private property, which alleviates the concerns of government endorsement raised in *Pinette. See id.* at 766, 115 S.Ct. 2440 (involving the presence of a cross on public property). This case even more clearly invokes the Association's constitutional rights of free exercise and free speech because they have validly purchased the land.

The Seventh Circuit recently addressed a more factually analogous situation and, following the analysis in *Pinette,* analyzed whether a reasonable person would perceive government endorsement of religion. *Freedom From Religion Foundation,* 203 F.3d at 496. The Seventh Circuit held the presence of a statue of Christ in a city park to be unconstitutional, even after upholding the city's sale of .15 acre of land containing the statue to a private memorial fund. There, the private land had no visual boundaries that would inform the reasonable observer that the statue sat on private property. *Id.* at 494. The Seventh Circuit suggested that a fence to separate the public from private property and a clearly visible disclaimer would effectively remedy the appearance of government endorsement. *Id.* at 497. *See Freedom From Religion Foundation v. City of Marshfield,* 2000 WL 767376 (W.D.Wis. May 9, 2000) (Mem.) (finding upon remand that a ten foot wall around the statue is more than what is reasonably necessary to remedy the Establishment Clause violation). Thus, the facts relevant to the issue of continuing endorsement of religion here differ in a crucial way from *Freedom From Religion Foundation* because the Association plans to construct clearly visible boundaries around the private land, to display disclaimers, and has worked diligently on its promised improvements for the memorial.

■ With such clear demarcations between the surrounding public property and the private property on which the cross sits, a reasonable observer would not conclude that the government endorsed the presence of the cross. Moreover, we decline to adopt a rule that would infringe upon private property owners' constitutional rights to display religious symbols on their land simply because their land sits next to publicly owned land or was formerly on public land. The fact that some hypothetical observer viewing the cross from afar could conceivably confuse its presence to be on public land, does not justify forcing a private landowner to sacrifice its own constitutional rights. We follow the Supreme Court's admonition that too broad a reading of the Establishment Clause would have "radical implications for our public policy." *Pinette,* 515 U.S. at 768, 115 S.Ct. 2440.

## III.   CONCLUSION

The half-acre parcel of land underneath the cross was sold to a private party in an open and publicized neutral bidding process. Sufficient demarcations make it clear that the cross sits on private property. Accordingly, we conclude that the presence of the cross on this private property does not violate the California or United States Constitution. Furthermore, because the land was legitimately sold to the private Association, we must recognize and protect the Association's rights of Free Exercise and Free Speech as the Constitution demands no less. For the foregoing reasons, the decision of the district court is AFFIRMED.