Philip K. **PAULSON**, Plaintiff–Appellant,

v.

**CITY OF SAN DIEGO**; Mt. Soledad Memorial Association, Inc., Defendants–Appellees.

No. 00–55406.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc March 21, 2002.

Filed June 26, 2002.

Jordan C. Budd, ACLU Foundation of San Diego & Imperial Counties, and James E. McElroy, Law Offices of James E. McElroy, San Diego, CA, for plaintiff-appellant.

Casey Gwinn, City Attorney, and Anthony J. Shanley, Deputy City Attorney, The City of San Diego, and Charles V. Berwanger, Higgs, Fletcher & Mack LLP, San Diego, CA, for defendants-appellees.

Before: SCHROEDER, Chief Judge, and PREGERSON, KOZINSKI, FERNANDEZ, RYMER, T.G. NELSON, HAWKINS, GRABER, W. FLETCHER, BERZON, and RAWLINSON, Circuit Judges.

Opinion by Judge GRABER; Dissent by Judge FERNANDEZ.

GRABER, Circuit Judge.

This appeal is the latest chapter in a protracted saga centered around a 43–foot–high Latin cross that stands atop Mt. Soledad in San Diego, California. In an earlier chapter, we held that the presence of the cross in a publicly owned park violates the California Constitution, and we therefore affirmed an injunction forbidding the city from maintaining the cross on public land. In this chapter, we hold that the way in which the City of San Diego sold the cross to a private entity, which now maintains the cross, also violates the California Constitution. Because both the constitutional infirmity and the injunction remain in place, we return the case to the district court to write the next installment.

BACKGROUND

The City of San Diego (City) owns Mt. Soledad, a 170–acre parcel of land that was dedicated to public use in 1916 as "Mt. Soledad Natural Park." Although most of the park is undeveloped and is maintained in its natural state, the top of the mountain has been cleared. The cross in question, which is constructed of concrete, stands in the center of the clearing where it was erected by the Mt. Soledad Memorial Association (Association) in 1954.

This cross is the third that has stood atop Mt. Soledad. The first was constructed by private citizens out of redwood in 1913. Vandals destroyed it in 1924. In 1934, someone replaced it with a cross made of wood and stucco. A windstorm destroyed that cross in 1952.

The San Diego City Council then granted permission to the Association to construct the current cross. In 1954, in a religious service held on Easter Sunday, the Association dedicated the cross as a tribute to veterans of World War I, World War II, and the Korean Conflict. The Association maintains the cross and obtains a permit from the City each year to host an Easter service at the cross. The cross also has been the site of weddings and baptisms. Although the Association has paid for most of the maintenance costs associated with the cross, public funds have been expended to maintain it as well.

Plaintiff Philip K. Paulson initiated this action in 1989, seeking to enjoin the City from allowing the Mt. Soledad cross to remain on public land. In 1991, the district court ruled that the presence of the cross in a publicly owned park violates the No Preference Clause of the California

Constitution, article I, section 4. *Murphy v. Bilbray,* 782 F.Supp. 1420, 1438 (S.D.Cal.1991), *aff'd sub nom. Ellis v. City of La Mesa,* 990 F.2d 1518 (9th Cir. 1993). The court permanently enjoined the presence of the cross on publicly owned land. In our opinion affirming the injunction, we recognized that the Mt. Soledad cross, to the extent that it could be characterized accurately as a war memorial, was "[a] sectarian war memorial carr[ying] an inherently religious message and creat[ing] an appearance of honoring only those servicemen of that particular religion." *Ellis,* 990 F.2d at 1527.

To remedy the constitutional violation and to comply with the injunction, the City decided to sell the land under the cross to a private organization. In order to accomplish the sale, and acting pursuant to section 55 of the City of San Diego Charter, the City submitted "Proposition F" to the voters in the 1992 election. That proposition provided:

> Shall the removal from dedicated park status of that portion of Mt. Soledad Natural Park necessary to *maintain* the property as *an historic war memorial,* and the transfer of the same parcel by The City of San Diego to a private nonprofit corporation for not less than fair market value be ratified?

(Emphasis added.)

The City's mayor and deputy mayor and several City Council members submitted a statement to the Voter Information Pamphlet in support of Proposition F. They explained that the purpose of Proposition F was to authorize the transfer of the land under the Mt. Soledad cross to the Association in order to "SAVE THE CROSS." The argument described the cross as a "historic landmark and a dedicated war memorial," and they urged a "YES" vote on the measure to "SAVE THE MOUNT SOLEDAD CROSS. SAVE OUR HISTO-RY." The voters approved the measure by a 76 percent majority.

Thereafter, the City sold approximately 222 square feet of land under the cross to the Association, in a negotiated sale for fair market value. Consistent with the statement in support of Proposition F contained in the voter pamphlet, the City sold the land to the Association, which had stated its intention to maintain the cross. The City did not solicit offers or consider proposals from any other prospective purchasers.

In September 1997, ruling on Paulson's motion to enforce the injunction, the district court held that this method of sale violated the No Preference Clause of article I, section 4, of the California Constitution. *Murphy v. Bilbray,* No. 90–134, 1997 WL 754604 (S.D.Cal. Sept.18, 1997) (unpublished decision). The court found that the sale complied with the City Charter and other policies governing negotiated sales. *Id.* at *7–*8. However, the court also found that the City's failure to consider other prospective buyers created the appearance that the City preferred the Christian religion and that the City's primary purpose for the sale was to preserve the cross. *Id.* at *10. The court further ruled that the amount of land sold was too small to remedy the City's original constitutional violation. *Id.* at *11. It reasoned that, because the parcel of land sold was so small, and was surrounded by land owned and maintained by the City, most visitors would not be aware that the City did not own and maintain the cross. That being so, the City had not remedied the appearance of preference. *Id.* The court entered an order stating: "Both the method of sale and the amount of land sold underneath the Mt. Soledad cross do not cure the constitutional infirmities outlined in this Court's previous Order." *Id.*

Following the district court's 1997 order, the City again attempted to dispose of the land beneath the cross. It expanded the size of the parcel available for purchase to 0.509 acres, and it published a notice that the City was inviting bids on the land. The City arranged for the Association "to quit-claim any property interests it may have in Mt. Soledad Natural Park, through escrow, to a future buyer as authorized by City Council." In exchange for the Association's agreement to quitclaim its interests in Mt. Soledad Natural Park, the City authorized an expenditure of $14,500 to refund to the Association its purchase money for the first sale.[1] The City received 42 requests for the bid proposal packets.

The introduction to "The City of San Diego's Invitation for Purchase Proposals[:] Mt. Soledad Memorial Site" stated:

The City of San Diego is inviting proposals from private non-profit corporations interested in purchasing approximately one-half acre of property in the Mt. Soledad Natural Park *for the purpose of maintaining an historic war memorial.* The property is presently the site of a large, concrete, Latin cross. The City is neither requiring nor precluding the retention or maintenance of a cross in its invitation for proposals.

(Emphasis added.) The Invitation clarified that the parcel of land for sale included land on which the cross stands. It further informed potential buyers of the Association's agreement to quitclaim its interests in the parcel for sale.

The Invitation explained that prospective purchasers had to submit four items. First, a proposal was required to include a "summary of the experience of the proposer and its qualifications to *maintain* the property as *an historic war memorial.*"

(Emphasis added.) The Invitation did not elaborate on what sort of qualifications were relevant to the maintenance of "an historic war memorial." Second, a proposer was required to submit a financial statement listing the proposer's current assets and liabilities and establishing the proposer's "financial ability to fund the full amount of the bid." Third, a proposer was required to describe the "Proposed Use" in a "[d]etailed outline for *the maintenance of an historic war memorial,* as authorized in the June, 1992, election." (Emphasis added.) Fourth and finally, the proposer was asked to submit a $5,000 deposit.

The Invitation outlined the criteria on which proposals would be evaluated:

1. Bid on the sale price.

2. Financial capability.

3. Expertise regarding the proposed use.

4. The use proposed—without regard to whether or not such proposal includes the retention or maintenance of a cross.

The Invitation did not explain how each factor would be weighted in the selection process, nor did it explain the criteria against which the proposed uses would be measured.

In response to the Invitation, five entities submitted proposals: the Mt. Soledad Memorial Association, Horizon Christian Fellowship, National League for the Separation of Church and State, St. Vincent DePaul Management, and Freedom From Religion Foundation. Three proposers—the Association, Horizon, and St. Vincent DePaul—stated that they intended to retain the current cross as a war memorial. The National League for the Separation of Church and State proposed a memorial to honor veterans and the Bill of Rights.

---

1. Because the City Council decided to sell the parcel to the Association at the second sale, the escrow arrangement was never put into effect. Instead, the Association simply received a $14,500 credit against its bid in the second sale.

The Freedom From Religion Foundation proposed a memorial to honor atheists and freethinkers.

Using forms entitled "Proposal Evaluation Notes," a three-member committee assessed the proposals based on the offer made, the proposer's financial capability both to fund the bid and to maintain a memorial, the proposer's experience, the proposer's operating plan, the proposer's responsiveness, and "other strengths or weaknesses." After conducting its review, the committee recommended that the City Council approve the sale to the Association. Speaking to the City Council on behalf of the committee, Will Griffith, the City's Acting Director of the Real Estate Assets Department, reported that the committee had determined that the minimum acceptable bid was $35,000. He then said:

> Based on our analysis and, and looking at these four categories, the RFP committee will be making a recommendation to choose the Mt. Soledad Memorial Association. The reason for this is that they put together overall the most comprehensive, well thought out proposal of all of the bids. Also, their bid price was the highest. Although they did make some statements that $106,000 was going to substantially deplete their reserves in their organization, they have shown a very strong track record over the 46 years of being involved in the memorial to being able to go out and solicit funds. They have ties with some of the veterans groups and have been able to solicit funds for maintenance of the, of the existing memorial.

The City Council members who were at the meeting voted unanimously to approve the sale to the Association.[2]

Paulson again brought a motion to enforce the injunction against the presence of the cross. He again argued that the method of sale violated the California Constitution because it favored the Association. He also argued that the amount of land sold was too small to cure the appearance of a preference.

This time, the district court denied Paulson's motion. The court concluded that the sale was not structured to prefer the Association, based on its determination that the City had established a "neutral" process for evaluating bids and that the City had sold the land to the Association because it was the highest bidder. Finally, the court held that, because the sale involved an "open and apparently neutral bidding process," the method of sale "did not violate the California Constitution's prohibition against the preference of religion."

## STANDARDS OF REVIEW

■ We review for abuse of discretion the district court's decision not to enforce an injunction. *Herrington v. County of Sonoma*, 12 F.3d 901, 907 (9th Cir.1993). The district court abuses its discretion if (among other things) it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id.* at 907–08.

■ We review de novo the district court's interpretation of state law. *Churchill v. F/V Fjord (In re McLinn)*, 739 F.2d 1395, 1398 (9th Cir.1984) (en banc). When interpreting state law, we are bound to follow the decisions of the state's highest court. *Hewitt v. Joyner*, 940 F.2d 1561, 1565(9th Cir.1991). "When the state supreme court has not spoken on an issue, we must determine what result the court would reach based on state appellate court opinions, statutes and treatises." *Id.*

---

2. One member was absent on the day of the vote.

## DISCUSSION

Plaintiff argues that the second sale of the land violates two provisions of the California Constitution: article I, section 4, which guarantees "[f]ree exercise and enjoyment of religion without discrimination or preference," and article XVI, section 5, which prohibits aid to "any religious sect, church, creed, or sectarian purpose." The district court recognized that Plaintiff premised his motion to enforce the injunction on those similar, but distinct, constitutional provisions, yet the court failed to analyze the sale separately under each provision. The California Supreme Court has made clear that the determination whether government conduct violates article I, section 4, requires a different analysis from the determination whether the same conduct contravenes article XVI, section 5. See E. Bay Asian Local Dev. Corp. v. California, 24 Cal.4th 693, 102 Cal. Rptr.2d 280, 13 P.3d 1122, 1139–40 (2000) (analyzing the No Preference Clause of article I, section 4, by reference to Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), while analyzing article XVI, section 5, under a separate, state-law framework), cert. denied, 532 U.S. 1008, 121 S.Ct. 1735, 149 L.Ed.2d 660 (2001). The district court thus made an error of law (and consequently abused its discretion) when it failed to analyze separately the requirements of article XVI, section 5.[3] To address that error, we examine article XVI, section 5, of the California Constitution.

■ Under California law, "[w]hen construing a constitution, courts view as the paramount consideration the intent of those who enacted the provision at issue. To determine that intent, courts look first to the language of the constitutional text, giving the words their ordinary meaning." Leone v. Med. Bd. of Cal., 22 Cal.4th 660, 94 Cal.Rptr.2d 61, 995 P.2d 191, 194 (2000) (citations omitted). Accordingly, we begin with the constitutional text at issue.

Article XVI, section 5, of the California Constitution[4] provides, in pertinent part:

> Neither the legislature, *nor any* county, *city and county*, township, school district, or other municipal corporation, *shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose*, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; *nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever.*

(Emphasis added.)

Given the ordinary meaning of those words, the text of the provision has enormous breadth. It is possible for the government's transfer of "anything" to violate the provision if the transfer is "in aid of" any "sectarian purpose." Therefore, all forms of governmental "aid" are subject to scrutiny. Further, when this provision was adopted in 1879, the term "purpose" commonly meant in this context an "[e]nd;

---

3. None of the district court's findings of historical fact is clearly erroneous.

4. This provision was formerly numbered article XIII, section 24. West's Ann. Cal. Const. art. 16, § 5; *Cal. Educ. Facilities Auth. v. Priest*, 12 Cal.3d 593, 116 Cal.Rptr. 361, 526 P.2d 513, 520 (1974). Before that, it was numbered article IV, section 30. West's Ann. Cal. Const. art. 16, § 5; *Frohliger v. Richardson*, 63 Cal.App. 209, 218 P. 497, 498 (1923). The text has remained substantially constant. For convenience, we will refer to it as article XVI, section 5, throughout our discussion.

effect; [or] consequence." Worcester, Joseph E., A Dictionary of the English Language 1158 (New ed. Supp. 1897). In other words, aid to a sectarian purpose simply meant aid to a sectarian use. Moreover, the section specifically prohibits the transfer of real or personal property for any "sectarian purpose."

The relevant California Supreme Court cases confirm our view that the text of article XVI, section 5, is expansive. It " 'forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes.' " *E. Bay*, 102 Cal.Rptr.2d 280, 13 P.3d at 1140(quoting *Cal. Educ. Facilities Auth. v. Priest*, 12 Cal.3d 593, 116 Cal.Rptr. 361, 526 P.2d 513, 521 n. 12 (1974)). Indeed, the court has stated that this section is "the d[e]finitive statement of the principle of government impartiality in the field of religion." *Priest*, 116 Cal.Rptr. 361, 526 P.2d at 520 (citation and internal quotation marks omitted). According to the California Supreme Court, this section was intended by its framers "to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." *Id.*

Neither the California Supreme Court nor any California Court of Appeal has considered the application of article XVI, section 5, to facts resembling those presented in this case, even though the decided cases cover a wide range of disparate topics. Nonetheless, we distill three themes from the precedents.

*First*, article XVI, section 5, is so broad that state or local governments need not provide a financial benefit or tangible aid in order to violate the provision; they violate it by doing no more than lending their "prestige and power" to a "sectarian purpose." *Feminist Women's Health Ctr., Inc. v. Philibosian*, 157 Cal.App.3d 1076, 203 Cal.Rptr. 918, 920–22, 927 (1984) (holding that, although state law authorized the district attorney to dispose of evidentiary fetal tissue by interment, to inter the tissue at a location where a religious memorial ceremony would be held would unconstitutionally "enlist the prestige and power of the state" in the burial ceremony).

*Second*, even a government act that has a secular purpose can violate article XVI, section 5, if it also has a direct, immediate, and substantial effect of promoting a sectarian purpose. Thus, in *Frohliger v. Richardson*, 63 Cal.App. 209, 218 P. 497, 500 (1923), the California District Court of Appeal held that article XVI, section 5, bars public aid for the purpose of restoring the California missions, despite the undeniable importance of the missions to the history of California:

> We concede that the California missions are of historical and educational interest from a cultural and literary standpoint, but they approach no such classification as would make them the basis of the state's bounty or the subject of legislative appropriation in the guise of the public interest, public good, or public welfare.

The presence of a financial benefit to the owner of the missions—the Catholic Church—rendered the aid invalid. *Id.*

Similarly, in *County of Los Angeles v. Hollinger*, 221 Cal.App.2d 154, 34 Cal. Rptr. 387, 388, 392–93 (1963), the fact that Los Angeles County had a secular purpose—promoting commerce and tourism—for ordering films of a Christian holiday parade from a parade association did not prevent the contract for the films from violating article XVI, section 5. The arrangement was unconstitutional because the making of the films and the county's use of them would provide forbidden, "official" support for both the organization and

the religious subject matter of the parade. *Id.* at 391–92.

Likewise, in *California Teachers Ass'n v. Riles*, 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953, 964 (1981), the California Supreme Court invalidated a state textbook loan program under article XVI, section 5. Although the program was open to students in all nonprofit, nonpublic schools (not just sectarian schools) and provided the books to the eligible students (not to the schools) the supreme court nevertheless held that the program unconstitutionally aided sectarian schools, because textbooks "are a critical element in enabling the school to carry out its essential mission to teach the students." *Id.* at 953 n. 1, 963.

The *third* and final theme to emerge from the California cases construing article XVI, section 5, is a corollary to the second theme: Government conduct that aids religious or sectarian purposes, but that does *not* have a direct, immediate, and substantial effect, does not contravene the provision. *E. Bay,* 102 Cal.Rptr.2d 280, 13 P.3d at 1140. The section "does not prohibit indirect, remote, or incidental benefits that have a primary public purpose." *Id.* For the purpose of article XVI, section 5, a benefit related to a "primary public purpose" qualifies as "indirect, remote, or incidental" if it is available "on an equal basis" to sectarian and nonsectarian organizations *and* if it "does not have a substantial effect of supporting religious activities." *Priest,* 116 Cal.Rptr. 361, 526 P.2d at 521–22. For example, in *Priest,* the California Supreme Court upheld a statutory program that permitted colleges—both sectarian and nonsectarian—to borrow money at below-market rates for improvements to their facilities, so long as the relevant facilities were not used for sectarian purposes. *Priest,* 116 Cal.Rptr. 361, 526 P.2d at 515, 521–22. The supreme court reasoned that any aid to sec-

tarian purposes was merely incidental to the Act's primary public purpose of encouraging higher education. *Id.* at 521.

In the same vein, and relevant to this case, the California Court of Appeal held in *Woodland Hills Homeowners Organization v. Los Angeles Community College District,* 218 Cal.App.3d 79, 266 Cal.Rptr. 767, 774 & n. 9, 777 (Ct.App.1990), that the long-term lease of land by a community college district to a synagogue did not violate article XVI, section 5. The court characterized the benefit to the synagogue from the lease as "incidental" to the district's primary public purpose of making money from the land, in part because "[t]he evidence established that religious and secular groups had equal opportunity to obtain the government benefit." *Id.* at 776; *see also Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco,* 784 F.2d 1010, 1014, 1016 (9th Cir.), *amended by* 792 F.2d 124 (9th Cir.1986) (holding that the rental of commercial space in a publicly owned airport for use as a Christian Science reading room did not violate article XVI, section 5, because the benefit to religion qualified as incidental: "[T]here is no suggestion that all religions did not have the same opportunity to rent space, or that groups with views opposed to organized religion, or with any other social or philosophical view, were denied that opportunity.").

In summary, the California appellate cases make clear that article XVI, section 5, prohibits the government from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental. A sectarian benefit that is ancillary to a primary secular purpose may qualify as "incidental" if the benefit is available on an equal basis to those with sectarian and those with secular objectives. With those princi-

ples in mind, we examine whether the second sale of the Mt. Soledad land to the Association violated article XVI, section 5.

■ In view of our holding in *Ellis* that the Mt. Soledad cross is a sectarian symbol that conveys a religious message, governmental conduct that operates affirmatively to preserve the cross aids a sectarian purpose: the preservation of a symbol that conveys a specifically Christian message.[5] *Cf. Frohliger,* 218 P. at 500(holding that the "meritorious movement" to restore and preserve Catholic missions could not be accomplished constitutionally through public assistance). The question then becomes whether the manner in which the City structured the sale directly, immediately, and substantially aided the sectarian purpose of preserving the cross. *Brown v. Woodland Joint Unified Sch. Dist.,* 27 F.3d 1373, 1385(9th Cir.1994). Because the structure of the sale provided a financial incentive to maintain the cross, the answer is "yes."

Here, the City sought to sell the land atop Mt. Soledad for the undeniably appropriate secular purpose of ensuring the presence of a war memorial on the site. California law nevertheless requires us to analyze whether the City's conduct *also* aided a sectarian purpose. Complicating matters for the City is the fact that the land for sale is the site of the cross, a sectarian war memorial. In the Invitation, the City made clear that (1) the cross would be conveyed to the purchaser of the land,[6] (2) the purchaser could satisfy the condition that the site be used as a war memorial by keeping the cross there, and (3) the highest purchase price and the buyer's financial capability were keys to a successful bid. The City thereby granted a direct, immediate, and substantial benefit in aid of a Christian message. To those potential buyers who wanted to preserve the cross or convey its message, the City gave away for free an economically valuable means of fulfilling the main condition of the sale. By contrast, to those potential buyers who wanted to construct a nonsectarian war memorial, the City conveyed nothing that would help satisfy the obligation to maintain the site as a war memorial. To the contrary, those purchasers would be saddled with the costs of removing the cross and of constructing an alternative memorial.

The immediacy of the benefit is readily apparent; no further action by anyone stood between the City and the beneficiary of the grant. That the benefit was not merely incidental to the City's primary secular purpose in conveying the land also is readily apparent. Because the sale was

---

**5.** As noted above, the phrase "sectarian purpose" merely connotes a sectarian use rather than a subjective state of mind. However, even if a subjective goal on the part of the City were required here, a "sectarian purpose" is shown. For example, the City wrote its invitation for bids to state that the proposed sale was "for the purpose of maintaining an historical war memorial." The only war memorial in that location that could qualify as "historic" was the cross.

**6.** Earlier in this litigation it was unclear who owned the cross—the Association or the City. *Ellis v. City of La Mesa,* 990 F.2d 1518, 1530–31 (9th Cir.1993) (Beezer, J., specially concurring). When the first sale was invalidated,

the City arranged to give back the Association's purchase money in exchange for the Association's agreement to quitclaim "any property interests" it had in Mt. Soledad Natural Park to the future purchaser of the land, so that the land—cross and all—could be conveyed to the next purchaser.

Even if the quitclaim agreement was not intended to convey the Association's interest in the cross, the second sale would still fail because, in that event, the sale was structured to give *the Association alone* a financial benefit from the unconstitutionally maintained cross, to the detriment of other bidders who were not similarly permitted to benefit from a long-standing unconstitutional relationship with the City.

structured to provide a valuable financial benefit to those supporting the preservation of the cross, it cannot be said that the benefit provided by the sale was available "on an equal basis" to potential buyers who had the purpose of constructing a secular memorial.

That the financial benefit to a bidder proposing to preserve the cross was both direct and substantial is best illustrated by an example. Suppose that two similarly situated bidders—Bidder # 1 and Bidder # 2—each had the minimum acceptable amount of $35,000 to bid on the project, and Bidder # 1 proposed to retain the cross, while Bidder # 2 proposed to construct a secular memorial. The structure of the sale ensured that Bidder # 1 would be awarded the land. Bidder # 1 could bid the full $35,000 and still demonstrate the financial capability to maintain a historic war memorial because the City would subsidize the cost of Bidder # 1's proposed memorial by conveying the cross. Bidder # 2 could not compete successfully with Bidder # 1: If Bidder # 2 matched Bidder # 1's bid, then Bidder # 2 could not demonstrate the financial capability to maintain a historic war memorial, because all of Bidder # 2's resources would have been dedicated to the bid price, and none would have been reserved to fund removal of the cross and construction of a new memorial. Alternatively, Bidder # 2 could reserve the money needed to remove the cross and construct the new memorial. But that option would eliminate Bidder # 2 from the process, because Bidder # 2's bid in that instance would fall below the minimum acceptable bid.

In short, by establishing a specified use as a condition of sale (the maintenance of a war memorial) and then providing gratis the means to satisfy that condition to only those bidders who supported the preservation of the cross, the City gave a direct, immediate, and substantial economic incentive to advance a sectarian message. An economic incentive of that kind and magnitude qualifies as aid to a sectarian purpose within the meaning of article XVI, section 5; it enlisted the power and prestige of the City in support of the preservation of the cross, devoted financial resources of the City government to a sectarian purpose, and granted City property for a sectarian purpose.

The effect of the City's aid to a sectarian purpose is evident, as a practical matter, in the outcome of the sale challenged in this action. Because the Association intended to preserve the cross, and thus had no need to reserve funds for removal or construction costs, it was able to bid $106,-000—the full extent of its resources. Had the Association not been able to rely on the retention of the cross (at no cost) to satisfy the condition that the site be maintained as a war memorial, its bid necessarily would have been lower. Although we cannot tell from the record whether the bid ultimately would have been less than the bids of those who proposed a secular memorial, the advantage to the Association of being able to expend the entirety of its resources on the bid price, while still being able to meet the other criteria for sale, was direct, immediate, and substantial.

## CONCLUSION

The second sale of the Mt. Soledad land on which the cross stands was structured to provide a direct, immediate, and substantial financial advantage to bidders who had the sectarian purpose of preserving the cross. For that reason, the sale violated article XVI, section 5, of the California Constitution.[7]

7. Because we hold that the method of sale violated article XVI, section 5, we do not reach Plaintiff's argument under article I, section 4, of the California Constitution or under the First Amendment to the United States

No doubt there are several possible ways to cure this violation. We leave it to the parties and to the district court, in the first instance, to devise a remedy for the constitutional violation that we identified in *Ellis*.

REVERSED and REMANDED.

FERNANDEZ, Circuit Judge, with whom RYMER, T.G. NELSON, and RAWLINSON, Circuit Judges, join, dissenting.

This litigation has been in the federal courts for over 10 years, while Paulson and others have attempted to have the latest Mt. Soledad cross torn down.[1] Under the lash of court orders, including a prior appeal to this court,[2] the city finally satisfied the district court that it had disposed of the cross and a sufficient amount of surrounding property in a neutral process that conveyed those to the highest private bidder. There is absolutely no relevant dispute over the historical facts as found by the district court. The property did go to the highest bidder; the purchaser was required to maintain a war memorial (the site had been given over to that general purpose since 1954); but there was no restriction whatsoever on the configuration of that memorial—nothing prescribed or proscribed the removal of the cross itself.

This case, therefore, presents us with pure legal questions. Those questions were answered with clarity and precision in an opinion by a panel of this court. *Paulson v. City of San Diego*, 262 F.3d 885 (9th Cir.2001),[3] rehearing en banc granted, 281 F.3d 812 (9th Cir.2002). Unfortunately, that excellent opinion[4] has been superseded by this en banc proceeding, but I now adopt it in full as my dissent in this case.[5]

Thus, I respectfully dissent.

## ATTACHMENT A

## FOR PUBLICATION

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

Philip K. Paulson, Plaintiff–Appellant,

v.

Constitution, and we express no view on those questions.

1. I say "latest" because its erection followed the erection and destruction of others in a series commencing in 1913.

2. *See Ellis v. City of La Mesa*, 990 F.2d 1518, 1527–28 (9th Cir.1993); *Murphy v. Bilbray*, 1997 WL 754604, at *9–*11 (S.D.Cal. Sept.18, 1997); *Murphy v. Bilbray*, 782 F.Supp. 1420, 1436–38 (S.D.Cal.1991).

3. For the convenience of the readers of this dissent, I incorporate Attachment A, which is the slip copy of the panel's opinion.

4. While I see no real need to gloss that opinion, I cannot eschew indicating that I remain troubled by the myriad of complex and convoluted tests that have arisen in the area of constitutional protection of religious rights.

As I see it, the fact that a public entity is neutral on the issue of religion should suffice to meet the constitutional strictures that it neither interfere with free exercise, nor establish, nor yet prefer or discriminate against religion. *See Gentala v. City of Tucson*, 244 F.3d 1065, 1082–86 (9th Cir.) (en banc) (Fernandez, J., dissenting), *vacated*, —— U.S. ——, 122 S.Ct. 340, 151 L.Ed.2d 256 (2001); *Goehring v. Brophy*, 94 F.3d 1294, 1306–07 (9th Cir.1996) (Fernandez, J., concurring); *Am. Jewish Cong. v. City of Beverly Hills*, 90 F.3d 379, 383–84 (9th Cir.1996) (en banc). The historic facts of the sale at hand demonstrate that the city did not stray from the path of neutrality. No matter how timorous or cautious we are about religion, the city's action cannot be seen as minatory.

5. The en banc majority concentrates its attention on the California Constitution, but I adopt the panel's disposition on both United States and California constitutional grounds.

City of San Diego; Mt. Soledad Memorial Association, Inc., Defendant–Appellee.

No. 00–55406.

Appeal from the United States District Court for the Southern District of California; Gordon Thompson, Jr., Senior District Judge, Presiding. D.C. No. CV–89–00820–GT.

Argued and Submitted April 4, 2001.

Filed August 22, 2001.

Before: Procter Hug, Jr., John M. Duhe, Jr.,* and Richard C. Tallman, Circuit Judges.

Opinion by Judge Hug.

**COUNSEL**

James E. McElroy, Law Offices of James McElroy, San Diego, California, for the appellant.

Casey G. Gwinn, City Attorney, and Anthony J. Shanley, Deputy City Attorney, San Diego, California, for appellee City of San Diego.

Charles V. Berwanger, Higgs, Fletcher & Mack LLP, San Diego, California, for appellee Mount Soledad Memorial Association.

**OPINION**

HUG, Circuit Judge:

We are presented with the issue of whether the presence of a Latin cross on private property surrounded by publicly maintained park land atop Mount Soledad in San Diego, California, violates the California and United States Constitutions. The cross sits on land previously owned by the city of San Diego. The district court earlier had issued an injunction against the cross's presence on publicly owned land for violation of the No Preference Clause of the California Constitution. The city sub-sequently sold a half acre parcel beneath the cross through a publicized and open bidding process. The district court found this sale sufficient to cure the constitutionally impermissible appearance of preference for religion by the city. We agree with the district court and AFFIRM its decision denying as moot Appellant's motion to enforce the previous injunction.

**I. BACKGROUND**

Mount Soledad Natural Park is approximately 170 acres of land forming a mountain with a flat cleared area at the top. The flat portion has a driveway and parking area which encircles a relatively small area of land with a 43 foot high cross. Since 1913, a cross has stood in the area where the Mt. Soledad cross now stands. After a wind storm destroyed the then existing cross in 1952, the city council granted permission to the Mt. Soledad Memorial Association (the Association) to place another cross on Mt. Soledad. In 1954, the current cross was dedicated to veterans of World Wars I & II and the Korean War.

Immediately outside the parking area surrounding the cross is a cleared area with benches and a public sidewalk. The cross is visible from various places in the park and around the city including a portion of the interstate highway. The cross has been the subject of litigation for approximately ten years. A more complete history of the events involved in the previous litigation is set forth in our decision in *Ellis v. City of LaMesa*, 990 F.2d 1518, 1527 (9th Cir.1993). Thus, we present a summary here as it pertains to the instant decision.

In December 1991, the district court ruled that the presence of the cross on publicly

---

* Honorable John M. Duhe, Jr., Senior United States Circuit Judge for the Fifth Circuit, sit-  ting by designation.

owned land in Mount Soledad Park violated the No Preference Clause of the California Constitution. *Murphy v. Bilbray*, 782 F.Supp. 1420, 1438(S.D.Cal.1991), *aff'd*, 990 F.2d 1518 (9th Cir.1993). The court issued a permanent injunction forbidding the permanent presence of the cross on publicly owned land. On appeal, we affirmed the injunction, holding that the mere designation of the cross as a war memorial was not enough to satisfy the separationist No Preference Clause of the California Constitution. *Ellis*, 990 F.2d at 1528. In response to the injunction, the city sold approximately 222 square feet under the cross to the Association in a negotiated sale for fair market value. At that time, the city did not solicit or consider any bids or offers from other prospective buyers of this land and the Association clearly stated its intention to keep the cross as part of its proposed war memorial.

In September 1997, the district court ruled that both the method of sale and the amount of land sold failed to remedy the original constitutional infirmities. *See Murphy v. Bilbray*, 1997 WL 754604 (S.D.Cal. Sept.18, 1997). Although the court found that the negotiated sale complied with requirements under the city's Charter and Council Policy, it also found the method of sale unconstitutional. Because the city sold the land to the Association in a private negotiated sale without considering any other offers or bids, the sale gave the appearance that the city was preferring the Christian religion by trying to save the cross. Also, the city sold only a tiny plot of land, 222 square feet, directly under the cross while the remaining developed land surrounding the cross was still owned and maintained by the city. The court found that the method of sale made apparent that the city's primary purpose for the sale was to preserve the cross.

The negotiated sale with the Association did not allow any other entity the opportunity to buy the plot of land underneath the cross. The district court emphasized that it was this exclusion of any other purchasers of or bidders for the land that gave the appearance of preferring the Christian religion over all others. Additionally, the court found that under those circumstances most visitors would not be aware that the city did not own and maintain the cross and, thus, the city had not remedied the appearance of preference for religion.

In July 1998, the city sold .509 acre of land (approximately 22,172 square feet) underneath the cross. The sale was a well publicized open bidding process and resulted in the land being sold to the Association for $106,000, which was the highest bid.[1] Philip Paulson brought a motion to enforce the injunction against the presence of the cross arguing that the recent sale did not cure the constitutional problems. Specifically, Paulson contends that the city structured the bidding process to favor the Association in a continued effort to save the cross and that the parcel sold was still too small to alleviate the appearance of preference for religion.

The district court found the sale constitutional and concluded that the method of sale, amount of land sold, and the proposed improvements divested the city of any appearance of preference for religion. As discussed below, the Association presented plans for significant improvements to the memorial including erecting twenty-six

---

1. St. Vincent de Paul Management made a bid of either $50,000 or, in the alternative, $5,000 more than the highest bidder. The committee treated the bid as a simple $50,000 offer because permitting a bid computed by reference to another bid would render the bidding process meaningless.

concrete bollards, placing one every twenty feet, surrounding the memorial site with a plaque between each bollard stating "Mount Soledad Veterans' Memorial—Private Property." Accordingly, the district court denied as moot the motion to enforce the injunction. Paulson timely appealed.

## II. ANALYSIS

The district court's refusal to grant a motion to enforce an injunction is tantamount to a denial of injunctive relief. *Herrington v. County of Sonoma*, 12 F.3d 901, 907 (9th Cir.1993). We will reverse such a decision only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id.* at 907–908. We review de novo the district court's interpretation of state law. *See A–1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 335 (9th Cir.1996).

The California constitution guarantees the "free exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4. This provision, referred to as the No Preference Clause, prohibits not only actual preference but also any appearance that the government has allied itself with one specific religion.[2]

*Sands v. Morongo Unified Sch. Dist.*, 53 Cal.3d 863, 876, 281 Cal.Rptr. 34, 809 P.2d 809 (1991); *Hewitt v. Joyner*, 940 F.2d 1561, 1567 (9th Cir.1991). This parallels the guarantee of the Establishment Clause of the United States Constitution, which "prohibits the government from appearing to take a position on questions of religious belief." *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

Although some California courts have interpreted the No Preference Clause as being more protective of the principle of separation than the federal guarantee,[3] the California Supreme Court has recently suggested otherwise. *Compare Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal.Rptr. 913, 916 (1989) with *East Bay Asian Local Development Corp. v. State of California*, 24 Cal.4th 693, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000).[4] The California Supreme Court concluded that it was not necessary to construe the No Preference Clause of the California Constitution because the government action satisfied the *Lemon* test,[5] which is applied to challenges under the Establishment Clause of the United States Constitution and, thus, was neither a governmental preference for or discrimination against religion. *Id.* at 719, 102 Cal.Rptr.2d 280, 13 P.3d 1122.[6] This suggests that the

**2.** Another provision of the state constitution, Article XVI, section 5, strictly prohibits any governmental support for religious purposes. The California Supreme Court has interpreted this provision to ban any form of governmental involvement "which has the direct, immediate, and substantial effect of promoting religious purposes." *California Educ. Facilities Auth. v. Priest*, 12 Cal.3d 593, 606 n. 12, 116 Cal.Rptr. 361, 526 P.2d 513 (1974). Paulson has failed to establish a violation of this provision. As discussed below, the sale and transfer of land here do not have a direct, immediate and substantial effect of promoting religion.

**3.** The district court noted this and reviewed the challenges under the state constitution with this concept of a "Jeffersonian wall of separation between church and state" in

mind, avoiding the federal constitutional questions. To the extent there is a difference between the relevant religion clauses of the federal and state constitutions, we conclude that the government action here passes muster under both.

**4.** Although we recognized this earlier and broader interpretation in *Hewitt*, our opinion in that case pre-dated the California Supreme Court's recent discussion of the state constitution's religion clauses in *East Bay*.

**5.** *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

**6.** The full statement in the opinion is as follows:
This court has never had occasion to definitively construe the no preference clause of

United States Constitutional standard is either equally restrictive or more restrictive than the No Preference Clause of the California Constitution.

Paulson challenges the district court's decision on two grounds. First, he objects to the method of sale, asserting that the city structured the bidding process to give the Association an advantage. Second, he contends that the amount of land sold to the Association is insufficient to eliminate an appearance of preference for religion by the city.

*A. The Method of Sale*

Paulson argues that the city's sale of the half acre parcel under the cross to the Association demonstrated an unconstitutional preference and aid to the Christian religion. Despite the fact that the most recent sale was conducted in a publicized and open bidding process, Paulson maintains that the city structured the process to give the Association an advantage by requiring maintenance of a war memorial on the property and considering the bidders' experience in maintaining a war me-

morial. Paulson further argues that it was improper for the city to retain complete discretion to accept or reject any bid for any reason.

The city's invitation for purchase proposals solicited nonprofit corporations interested in purchasing approximately one-half acre of property in the Mount Soledad Natural Park for the purpose of maintaining an historic war memorial. The invitation stated that the city was neither requiring nor precluding the retention of the cross. The invitation requested that proposals include a detailed outline for the maintenance of an historic war memorial.[7]

As the district court noted, the bidding process was open and publicized. The city received 42 requests for copies of the invitation and five serious proposals. The proposals were submitted by Horizon Christian Fellowship, the National League for the Separation of Church and State, Saint Vincent De Paul Management, Freedom From Religion Foundation, and the Association. The city established a committee and evaluation criteria. Of the five

---

article I, section 4 and we need not do so here. In guaranteeing free exercise of religion "without discrimination or preference," the plain language of the clause suggests, however, that the intent is to ensure that free exercise of religion is guaranteed regardless of the nature of the religious belief professed, and that the state neither favor nor discriminate against religion. Having concluded above that an exemption from a landmark preservation law satisfies all prongs of the Lemon test, it follows that the exemption is neither a governmental preference for or discrimination against religion. *East Bay*, 24 Cal.4th at 719, 102 Cal.Rptr.2d 280, 13 P.3d 1122.

**7.** Paulson faults this use restriction as having been authorized by the voters in 1992 in order to preserve the cross. This argument, however, digresses from the true issue of concern here which is how the most recent sale was actually conducted. Even an observer

who is aware of the cross's history on Mount Soledad would recognize that the procedurally neutral sale offered a possibility that a private buyer would remove rather than retain the cross.

These circumstances of a procedurally neutral sale to a private organization differ significantly from those in *Hewitt* which involved continuous county ownership of a park exclusively containing immovable biblical figures and statues of scenes from the New Testament. During the vast majority of the county's ownership of "Desert Christ Park," the park was allowed to appear as an extension of the nearby church, and brochures for the park contained citations to passages in the Bible. *Hewitt*, 940 F.2d at 1569. Paulson's reliance on *Hewitt* is misplaced. There, the county merely attempted to re-characterize the park, rather than divest itself of the religious message with an open sale to a private organization.

bids received, the Association's bid price of $106,000 was the highest.

Paulson does not challenge the continued use of the site as a war memorial. Rather, he argues that this use restriction favored the Association in the bidding process. The open and public bidding process, which could have resulted in a sale of the property to someone who would have removed the cross, makes a strong showing of the government's lack of preference of religion in imposing the use restriction. Imposing the use restriction here that requires that the property be used as it has in the past—as a war memorial—does not conflict with the Establishment Clause. *See Freedom From Religion Foundation v. City of Marshfield*, 203 F.3d 487, 491(7th Cir.2000) (en banc) (upholding use restriction that public property containing statue of Christ sold to private organization be maintained as a public park).

Paulson also contends that the consideration of the bidders' experience in maintaining a war memorial was improper. Our recognition of this use restriction as legitimate compels our conclusion that the consideration of a bidder's qualifications for maintaining a war memorial is not only logical and reasonable, but indeed prudent considering the intended and required function of the property.

Here, the city's sale of the property to the highest bidder did not constitute a preference in evaluation of the bids. *See Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.*, 218 Cal.App.3d 79, 95, 266 Cal.Rptr. 767 (1990). The evidence establishes that religious and secular groups had equal opportunity to purchase the land. Furthermore, a sale of real property generally is an effective way for a public body to end its inappropriate endorsement of religion. *See Freedom From Religion Foundation*, 203 F.3d at 491(upholding closed sale to private organization

because it complied with state laws and the city received fair market value for the land).

Paulson also challenges the provision of the invitation to bid stating that the city was not obligated to accept any proposal or to negotiate with any proposer and that the city council reserved the right to reject any or all proposals without cause or liability. The district court noted that all invitations for bids sent out by the city for any project contain this same language for liability reasons. Paulson argues that retaining such "unfettered" discretion leaves open the possibility of unconstitutional discrimination by the city. He relies on *American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379 (9th Cir.1996) (en banc).

In *American Jewish Congress*, we held that the city of Beverly Hills' ad hoc permitting system lent itself to abuse such that the city's decision to allow the erection of a menorah in a public park violated the Establishment Clauses of the California and Federal Constitutions. The permitting process in *American Jewish Congress* involved a general rule forbidding the erection of large unattended displays on public property but vested standardless discretion in its officials to grant exceptions to the rule. *Id.* at 383. There were no guidelines as to when an exception could be made, applicants were not informed of what requirements they had to meet to erect a display and sometimes application forms were not even used. *Id.* at 384. Moreover, it was not even clear where the decision making authority was vested. *Id.* Such truly absolute discretion without any standards is clearly distinguished from the city council's discretion here.

Paulson does not dispute that this discretion is retained in all bid invitations to avoid liability. Indeed, the city has ex-

plained that the invitation to bid was prepared, evaluated, and awarded according to well-established, written city procedures which mandate the inclusion of a provision permitting the city to reject any bid.

The bidding process was structured with explicit factors considered consistently for every bid. The structure of this process did not leave unfettered discretion to the city council and the result of the process here is consistent with the evaluated factors: the Association submitted the highest bid, a detailed proposal to create and maintain a war memorial, and had extensive experience in maintaining such a memorial. Paulson does not contend that the city used its discretion improperly here, but even if he did, the express factors considered provide a reviewable decision unlike the standardless decision in *American Jewish Congress.* Thus, the discretion retained by the city council here does not violate the State or Federal Constitution.

The analytical framework developed in *Lemon* provides three factors to be examined to assess whether governmental conduct is constitutionally forbidden under the Establishment Clause: (1) that there is a secular purpose; (2) that the principal or primary effect neither advances nor inhibits religion; and, (3) that an excessive government entanglement with religion is not fostered. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. California has also applied this test to analyze alleged violations of its own constitution's religion clauses. *See East Bay,* 24 Cal.4th 693, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000).

Applying the first prong here, the sale had the clearly secular purpose of ending an inappropriate endorsement of religion by transferring the land to a private entity which could retain or remove the cross in its own discretion. As discussed above, the bidding process and the ultimate sale neither preferred or discriminated against

religion and, thus, the challenged conduct satisfies the second prong of *Lemon.* Finally, to determine if the state is impermissibly entangled with religious activity under *Lemon's* third prong, we consider "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105.

Here, religious institutions did not necessarily benefit from the sale as they were merely provided the same opportunity as other members of the public in an open bidding process. The state provided no aid as it sought the highest bidder with the best qualifications under the enumerated factors. The only "resulting relationship" from the bidding process is that which existed during the short time that the actual transfer took place. That brief "relationship" which would have necessarily resulted with any sale, did not impermissibly entangle the government with religious activity. We conclude therefore, that the bidding process and the sale itself do not run afoul of the Establishment Clause of the First Amendment or the California Constitution. Having satisfied all prongs of the *Lemon* test, it also follows that the challenged acts were neither governmental preference for or discrimination against religion. *See East Bay,* 24 Cal.4th at 710, 102 Cal.Rptr.2d 280, 13 P.3d 1122.

Paulson also argues that the resulting transfer of ownership fails the *Lemon* test. The Supreme Court has applied *Lemon* or some variation thereof to cases involving religious displays on government property. *See Allegheny,* 492 U.S. at 592, 109 S.Ct. 3086 (applying *Lemon* to case involving creche and menorah on government property); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (applying *Lemon* to case involving govern-

ment owned creche). However, this case does not involve a religious symbol that will be maintained on public property, but rather a religious symbol on private property that was sold by the city. The issue on the transfer is the constitutionality of the sale to the private party, which as discussed above, satisfies *Lemon.* With the completion of the valid sale, the land became private property to which *Lemon* does not apply.

Because the land was sold in an open bidding process, with its express provision that the purchaser's intent to keep or remove the cross from the property would not be considered in evaluating bids, any appearance of preference for religion is dispelled. While this neutral transaction does sit in the shadow of the city's previous apparent endorsement to save the cross, under the open bidding process, the fact that someone could have bought the property and removed the cross neutralizes this history. Addressing this under the wording of the California Constitution, this process was not structured to "prefer" religion, and the process had sufficient procedural safeguards to not appear to a reasonable observer that the city had allied itself with religion. *See generally Sands,* 53 Cal.3d at 876, 281 Cal.Rptr. 34, 809 P.2d 809.

**B.  The Location of the Cross & Its Proximity to the Public Park**

Paulson contends that selling one half acre of land on which the cross is located does not cure the constitutional infirmity because it is still visable from some areas of the remaining public park land. As the district court noted, this is a 170 acre park most of which is rugged undeveloped open space with some trails and the cross is not even visible from many places within this undeveloped portion of the park. As the district court also noted, it appears that the amount of land sold to the Association includes all the land up to the public sidewalk that encircles the cross. Outside the public sidewalk, there is a circular public driveway, a public parking area and some cleared public land outside the driveway including an area of grass with benches and a water fountain. The cross is visible from the parking area and cleared portions of the park. The important consideration for this cleared area is whether the distinction between the public and private area is clearly marked.

In determining whether a reasonable observer would view the presence of the cross as a governmental preference for religion, the district court considered the Association's preparation of design and construction plans to develop the site as a war memorial. These plans involve erecting twenty-six concrete bollards, one every twenty feet, surrounding the memorial site. Between each bollard will be a plaque stating "Mount Soledad Veterans' Memorial Private Property." The Association also intends to install additional signs for the publicly owned portion of the park to further identify the memorial site as private property.

This enhanced demarcation of the site as private property rectifies any potential appearance of preference for religion. While it is conceivable that an observer from a significant distance could mistake the cross as being part of the public park, once that person reached the memorial site they would quickly recognize that the cross sits on private property. Additionally, the fact that this land is private both by its sale and designation, triggers protection of the Association's constitutional rights of Free Exercise and Free Speech. Requiring the removal of the cross from private property would infringe upon the Association's fundamental constitutional rights.

**C.  Establishment Clause, Free Exercise and Free Speech**

There is a crucial distinction between government speech endorsing religion, which the Establishment Clause prohibits, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 765, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). The distinction disappears when private speech can be mistaken for that of the government. *Id.* at 766, 115 S.Ct. 2440. When such a mistake renders private speech attributable to the government is not clear. In *Pinette*, a plurality warned that it would have "radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—*even reasonably*—confuse an incidental benefit to religion with state endorsement." *Id.* at 768, 115 S.Ct. 2440. The Supreme Court held that the state did not violate the Establishment Clause by permitting a private party to display an unattended cross on the grounds of the state capitol. Three Justices concurred in the judgment, noting that their vote to affirm was in large part because of the possibility of affixing a sign to the cross adequately disclaiming any government endorsement of it. *Id.* at 784, 115 S.Ct. 2440.

Assuming without deciding that *Pinette* even applies to a religious display on private property, the disclaimers and demarcations that the Association has installed and planned clearly designate the land and the cross as private property, which alleviates the concerns of government endorsement raised in *Pinette*. *See id.* at 766, 115 S.Ct. 2440 (involving the presence of a cross on public property). This case even more clearly invokes the Association's constitutional rights of free exercise and free speech because they have validly purchased the land.

The Seventh Circuit recently addressed a more factually analogous situation and, following the analysis in *Pinette*, analyzed whether a reasonable person would perceive government endorsement of religion. *Freedom From Religion Foundation*, 203 F.3d at 496. The Seventh Circuit held the presence of a statue of Christ in a city park to be unconstitutional, even after upholding the city's sale of .15 acre of land containing the statue to a private memorial fund. There, the private land had no visual boundaries that would inform the reasonable observer that the statue sat on private property. *Id.* at 494. The Seventh Circuit suggested that a fence to separate the public from private property and a clearly visible disclaimer would effectively remedy the appearance of government endorsement. *Id.* at 497. *See Freedom From Religion Foundation v. City of Marshfield*, 2000 WL 767376 (W.D.Wis. May 9, 2000) (Mem.) (finding upon remand that a ten foot wall around the statue is more than what is reasonably necessary to remedy the Establishment Clause violation). Thus, the facts relevant to the issue of continuing endorsement of religion here differ in a crucial way from *Freedom From Religion Foundation* because the Association plans to construct clearly visible boundaries around the private land, to display disclaimers, and has worked diligently on its promised improvements for the memorial.

With such clear demarcations between the surrounding public property and the private property on which the cross sits, a reasonable observer would not conclude that the government endorsed the presence of the cross. Moreover, we decline to adopt a rule that would infringe upon private property owners' constitutional rights

to display religious symbols on their land simply because their land sits next to publicly owned land or was formerly on public land. The fact that some hypothetical observer viewing the cross from afar could conceivably confuse its presence to be on public land, does not justify forcing a private landowner to sacrifice its own constitutional rights. We follow the Supreme Court's admonition that too broad a reading of the Establishment Clause would have "radical implications for our public policy." *Pinette,* 515 U.S. at 768, 115 S.Ct. 2440.

## III. CONCLUSION

The half-acre parcel of land underneath the cross was sold to a private party in an open and publicized neutral bidding process. Sufficient demarcations make it clear that the cross sits on private property. Accordingly, we conclude that the presence of the cross on this private property does not violate the California or United States Constitution. Furthermore, because the land was legitimately sold to the private Association, we must recognize and protect the Association's rights of Free Exercise and Free Speech as the Constitution demands no less. For the foregoing reasons, the decision of the district court is AFFIRMED.