**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL BARNES-WALLACE;
MAXWELL BREEN,
              *Plaintiffs-Appellees,*

              v.

CITY OF SAN DIEGO,
                    *Defendant,*

              and

BOY SCOUTS OF AMERICA —
DESERT PACIFIC COUNCIL,
              *Defendant-Appellant.*

No. 04-55732

D.C. No.
CV-00-01726-
NAJ/AJB

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE, Guardian Ad Litem;
LYNN BARNES-WALLACE, Guardian
Ad Litem; MICHAEL BREEN,
Guardian Ad Litem; VALERIE
BREEN, Guardian Ad Litem,
              *Plaintiffs-Appellants,*

              v.

CITY OF SAN DIEGO; BOY SCOUTS OF
AMERICA — DESERT PACIFIC
COUNCIL,
              *Defendants-Appellees.*

No. 04-56167

D.C. No.
CV-00-01726-
NAJ/AJB

ORDER
CERTIFYING
QUESTIONS TO
THE SUPREME
COURT OF
CALIFORNIA

Filed December 18, 2006

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

19465

Order;
Dissent by Judge Kleinfeld

## **ORDER**

We respectfully request the California Supreme Court to exercise its discretion and decide the certified questions presented below. *See* Cal. R. Ct. 29.8. The resolution of any one of these questions could determine the outcome of this appeal and no controlling California precedent exists. *See id.* We are aware of the California Supreme Court's demanding caseload and recognize that our request adds to that load. But we feel compelled to request certification because this case raises difficult questions of state constitutional law with potentially broad implications for California citizens' civil and religious liberties. Considerations of comity and federalism favor the resolution of such questions by the State's highest court rather than this court.

### I.    Questions Certified

The Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, leases land from the City of San Diego in Balboa Park and Mission Bay Park. The Council pays no rent for the Mission Bay property and $1 per year in rent for the Balboa Park property. In return, the Council operates Balboa Park's campground and Mission Bay Park's Youth Aquatic Center. The campground and the Aquatic Center are public facilities, but the Council maintains its headquarters on the campground, and its members extensively use both facilities. The Boy Scouts of America — and in turn the Council — prohibit atheists, agnostics, and homosexuals from being members or volunteers and requires members to affirm a belief in God.

The plaintiffs are users of the two Parks who are, respectively, lesbians and agnostics. They would use the land or

facilities leased by the Desert Pacific Council but for the Council's and Boy Scouts' discriminatory policies.

We certify to the California Supreme Court the following questions:

> 1.   Do the leases interfere with the free exercise and enjoyment of religion by granting preference for a religious organization in violation of the No Preference Clause in article I, section 4 of the California Constitution?

> 2.   Are the leases "aid" for purposes of the No Aid Clause of article XVI, section 5 of the California Constitution?

> 3.   If the leases are aid, are they benefitting a "creed" or "sectarian purpose" in violation of the No Aid Clause?

The California Supreme Court is not bound by this court's presentation of the questions. We will accept a reformulation of the questions and will accept the Supreme Court's decision. To aid the Supreme Court in deciding whether to accept the certification, we provide the following statement of facts, jurisdictional analysis, and explanation.

## II.   Statement of Facts

The Desert Pacific Council is a nonprofit corporation chartered by The Boy Scouts of America to administer Scouting programs in the San Diego area. The Council must adhere to the Boy Scouts' policies and rules. These rules include a prohibition against allowing youths or adults who are atheists, agnostics, or homosexuals to be members or volunteers. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (holding that the Boy Scouts has a constitutional right to exclude homosexuals). The Boy Scouts maintains that agnosticism,

atheism, and homosexuality are inconsistent with its goals and with the obligations of its members. *See Randall v. Orange County Council, Boy Scouts of Am.*, 17 Cal. 4th 736, 742 (1998) (reciting that, in defending its right to exclude atheists, the Boy Scouts introduced "evidence intended to establish that requiring the inclusion of nonbelievers . . . would interfere with the organization's efforts to convey its religious message"). The organization's mission is "to prepare young people to make ethical choices over their lifetimes by instilling in them the values of the Scout Oath and Law." [ER 2003 ¶ 162.] As part of the Scout Oath, each member and volunteer must pledge to "do my best . . . [t]o do my duty to God and my country" and to remain "morally straight." [*Id.* 2005 ¶ 176.] Duty to God is placed first in the Oath because it is "the most important of all Scouting values." [*Id.* 2004 ¶ 170.] Members also must agree to uphold the "Scout Law," which provides that Scouts are "Reverent" and "Clean." [*Id.* 2005 ¶ 176-77.] Membership and leadership applications contain a "Declaration of Religious Principle," which explains that "no member can grow into the best kind of citizen without recognizing an obligation to God." [*Id.* 1535.] The Boy Scouts instructs leaders to "be positive in their religious influence and . . . [to] encourage Scouts to earn the religious emblem of their faith." [*Id.* 1527.]

The plaintiffs Barnes-Wallaces are a lesbian couple and the plaintiffs Breens are agnostics. Because of their sexual and religious orientations, they cannot be Boy Scout volunteers. Both couples have sons old enough to join the Boy Scouts, and they would like their sons to use the leased facilities, but the parents refuse to give the approval required for membership. As part of the membership application, parents must promise to assist their sons "in observing the policies of the Boy Scouts of America . . . [to] serve as his adult partner and participate in all meetings and approve his advancement." [*Id.* 1533.] The application also includes the Scout Law and the Declaration of Religious Principle. The Barnes-Wallaces and the Breens believe the Boy Scouts' policies are discrimina-

tory, and they refuse to condone such practices by allowing their children to join.

In the plaintiffs' hometown of San Diego, the Desert Pacific Council leases, occupies, and operates portions of two popular city parks extensively used by the plaintiff families. The Council leases from the City sixteen acres in Balboa Park known as Camp Balboa. Camp Balboa offers a "unique" urban camping opportunity in the "heart of the City." [*Id.* 1966 ¶ 7.] The site includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office. Under the original lease, the Council paid $1 per year in rent. In 2002 the parties entered into a new twenty-five-year lease, which requires the Desert Pacific Council to pay $1 in annual rent and a $2,500 annual administration fee, and to expend at least $1.7 million for capital improvements over seven years.

The Desert Pacific Council makes exclusive use of portions of Balboa Park for its own benefit. The Council has its headquarters on park property. From this facility it oversees its $3.7 million budget, manages its thirty employees, and processes applications for membership and leadership positions. The Council has a print shop on park land that it uses to print literature for its members. These portions of the park are unavailable for public use. The Council also controls Camp Balboa's reservations. It pencils in reservations as far in advance as it wishes and then advertises the pre-reserved times to its members. The Council can declare the camp "closed," determine how many people are going to attend the camps, and then open up only the unreserved facilities to the public.[1]

---

[1]For example, the Desert Pacific Council advertised camping dates for all of 2002 in its Winter 2001 newsletter. In October 2002, it had already reserved the campsites for its 2003 summer camp. The 2001 reservation books show that the camp was closed during the Desert Pacific Council's spring and summer camps. Diagonal slashes or an "x" covered the reserva-

The Council also leases land on Fiesta Island in Mission Bay Park. In 1987, the City entered into a twenty-five-year, rent-free lease with the Desert Pacific Council for one-half acre of waterfront property on Fiesta Island. The City entered into this lease after the Desert Pacific Council approached it about building and operating an aquatic center on the island. The Council was awarded the lease on the condition that it expend $1.5 million to build the Youth Aquatic Center. The Council built and now operates the Aquatic Center, which offers boating, sailing, canoeing, and kayaking to San Diego youth.

Unlike Camp Balboa, the Aquatic Center has a formal first-come, first-served policy, but the policy has exceptions for Scout members. The Desert Pacific Council is permitted to reserve up to 75% of the facilities seven days in advance. The Council also hosts a members-only camp for four weeks each summer. The reservation books during camp say "YAC Closed for Summer Camp." The public cannot use the Aquatic Center during summer camp for water-based activities, but can reserve dormitories or other facilities the Scouts are not using.

The plaintiff families brought this action against the City of San Diego, the Boy Scouts, and the Desert Pacific Council, alleging that leasing public land to an organization that excludes persons because of their religious and sexual orientations violates the federal Establishment Clause, the California Constitution's No Preference[2] and No Aid[3] Clauses, the Fed-

---

tion books for these periods. The Council also reserved the entire campground for several days in February, March, and May 2001, and from December 31, 2001 to January 5, 2002. At one time the Desert Pacific Council informed non-Scout youth groups that they could make reservations not more than three months in advance and that the reservations would be accepted only if they did not conflict with "other scheduled Scouting functions."

[2]This Clause provides:

Free exercise and enjoyment of religion without discrimination or

eral and State Equal Protection Clauses, the San Diego Human Dignity Ordinance, and state contract law. The district court found the families had standing as municipal taxpayers and then allowed them to file an amended complaint. Both parties sought summary judgment. The court found that the leases violated the federal Establishment Clause and the California No Aid and No Preference Clauses and granted summary judgment in the families' favor. *Barnes-Wallace v. Boy Scouts of Am.*, 275 F. Supp. 2d 1259, 1276-80 (S.D. Cal. 2003). In the amended final judgment, the court enjoined the Balboa Park and Fiesta Island leases. The City then notified the Council that under the terms of the 2002 Balboa Park lease, the term tenancy was terminated and converted to a month-to-month tenancy. The families have since settled with the City. The Scout defendants appealed the district court's ruling.

## III.   Jurisdictional Analysis

Before proceeding further, we must satisfy ourselves that we have jurisdiction over this appeal. We have statutory jurisdiction over the appeal under 28 U.S.C. § 1291, but the parties have presented challenges to the existence of a case or controversy that is essential to our constitutional jurisdiction

---

preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting the establishment of religion.

Cal. Const. art. I, sec. 4.

[3]This Clause states:

Neither the legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose.

Cal. Const. art. XVI, sec. 5.

under Article III. *See Harrison W. Corp. v. United States*, 792 F.2d 1391, 1392 (9th Cir. 1986). We address these issues as threshold matters.

### 1.  Mootness

The plaintiffs argue that the appeal is moot as to the Balboa Park lease because the City terminated the lease after the district court's final judgment. The appeal is not moot because the Desert Pacific Council still has "a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851, 854 (9th Cir. 1999). The City did not terminate the Desert Pacific Council's tenancy, but rather converted it to a month-to-month, holdover tenancy. [ER 804.] The Council still occupies Camp Balboa, and the permissibility of its tenancy remains at issue in this appeal. Moreover, the City's notice terminating the lease indicated that, if the district court's judgment is reversed, the termination notice will be of no effect. The controversy with regard to the Balboa Park lease is not moot.

### 2.  Standing

The Boy Scouts challenges the standing of plaintiffs to bring this action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that standing is a component of the case-or-controversy requirement). Because the case was decided on summary judgment in the district court, the plaintiffs had the burden of showing by uncontroverted facts that they had standing to challenge the leases. *See id.* at 561. We conclude that the plaintiffs have sustained that burden, but we base standing on a different ground from that adopted by the district court.

The Barnes-Wallaces and the Breens have standing to pursue their claims because uncontroverted evidence shows that they suffered injuries in fact traceable to the Scout defendants' conduct that a favorable decision is likely to redress.

*See Lujan*, 504 U.S. at 560-61. The Barnes-Wallaces and the Breens submitted declarations asserting, without contradiction by the Scout defendants, that they used the parks and would like to use the facilities of the Scouts. They claim to have inferior access because their sexual orientation or agnostic beliefs precludes their becoming members. Such an "inability to unreservedly use public land suffices as [an] injury-in-fact." *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004); *see Separation of Church & State Committee v. City of Eugene*, 93 F.3d 617, 619 n.2 (9th Cir. 1996) (per curiam) (finding standing because plaintiffs "alleged that the cross prevented them from freely using the area on and around" the location of the cross); *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993) (explaining that "standing may be based on finding that the plaintiff has been injured due to his or her not being able to freely use public areas").

We conclude that no rational trier of fact could find that the plaintiffs had access to the leased facilities that was equal to that enjoyed by Scout members. Even construing the facts favorably for the Scout defendants, the evidence shows they have preferential — and at times exclusive — use of the leased parklands.[4]

The Scout defendants contend that the plaintiffs would have been able to use the Camp Balboa facilities if they had applied. There are two overflow campsites, the Scouts state, and "[t]here's always someplace in Camp Balboa to . . . fit somebody in." [SER 624-25.] They claim its members "never use 100% of the available space at Camp Balboa" and that other facilities, such as the swimming pool, can be used during their camps. The Boy Scouts' argument mistakenly assumes that access to Camp Balboa is equal because the campground is not closed for the Scouts' exclusive use. The

---

[4]For a detailed description of the Scouts' preferential use of the leased parklands, see *supra* pp. 19469-70.

public's access to the parkland is unequal because it is not on as favorable terms as that of the Boy Scouts.

The families also have unequal access to the Fiesta Island Aquatic Center. Again, the Boy Scouts mistakenly assumes that the public has equal access to the Aquatic Center because it is not completely closed to nonmembers. The Desert Pacific Council's control of the reservations allows it to gain exclusive access to the most sought-after facilities.

Neither the Breens nor the Barnes-Wallaces tried to gain access to Camp Balboa or the Aquatic Center, but this fact does not preclude standing. The families knew they would be subject to unequal or discriminatory treatment, and they did not have to subject themselves to such treatment to incur an injury. *See Ne. Fl. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)*; Bouman v. Block*, 940 F.2d 1211, 1221 (9th Cir. 1991). Their injury was the denial of equal treatment that resulted from a combination of the Boy Scouts' exclusion of atheists, agnostics, and homosexuals and the Scouts' preferential use of Camp Balboa and the Aquatic Center. *See Ne. Fl. Chapter*, 508 U.S. at 666 (explaining that the injury is "the denial of equal treatment resulting from the imposition of the barrier"). Accordingly, they were not required to attempt to use the portions of the park the Desert Pacific Council exclusively occupies or to make a reservation during Scout camp. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) (stating that a discriminatory employment policy can deter "those who are aware of it" from applying for jobs).

### 3.    The Families' Alternative Theories of Standing

We reject the families' other theories of standing. The Breens' and the Barnes-Wallaces' purposeful avoidance of the parklands leased by the Boy Scouts as a protest against the Scouts' exclusionary policies is not a sufficient injury. We have held that people can suffer a direct injury from the need

to avoid large religious displays, such as giant crosses or life-size biblical scenes. *See, e.g.*, *Buono*, 371 F.3d at 549 (five to eight-foot-tall cross); *SCSC*, 93 F.3d at 619 (fifty-one-foot-tall cross); *Ellis*, 990 F.2d at 1520 (thirty-six-foot and forty-three-foot-tall crosses); *Kreisner v. City of San Diego*, 1 F.3d 775, 777 (9th Cir. 1993) (ten by fourteen-foot displays containing life-size statuary of biblical scenes). But there are no displays in either Camp Balboa or the Aquatic Center that would be so overwhelmingly offensive that families who do not share the Scouts' religious views must avoid them. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (requiring the plaintiffs to show a personal injury suffered "as a consequence of the alleged constitutional error") (emphasis omitted).

Nor have the families suffered a direct injury caused by the requirement that they pay a fee to the Desert Pacific Council to use Camp Balboa or Fiesta Island. It is undisputed that user fees are deposited into the Council's general operating fund and therefore may be used for purposes other than the administration and upkeep of the parklands. Nonetheless, the families' injury is "conjectural or hypothetical" because they never paid the fee to the Boy Scouts. *Lujan*, 504 U.S. at 560 (citation omitted). Moreover, there is no showing that the fee conveys a net benefit to the Boy Scouts; on the contrary, the costs of maintaining the facilities exceed the user fees.

Finally, we disagree with the district court and conclude that the families do not have standing as municipal taxpayers because they have not suffered a "direct dollars-and-cents injury." *Doremus v. Bd. of Educ. of Hawthorne*, 342 U.S. 429, 434 (1952). The families characterize the leases as tax expenditures, but the Supreme Court recently held that "state taxpayers have no standing under Article III to challenge . . . state . . . spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1864 (2006).[5] The Court reasoned that the taxpayers

---

[5]The district court did not have the benefit of *DaimlerChrysler* at the time it ruled that the plaintiffs had taxpayer standing.

lacked standing to challenge a state tax break, in part because it was unclear whether the tax breaks would "deplete the treasury" and thus cause the taxpayers to suffer an "actual or imminent" injury. *Id.* at 1862 (internal quotations omitted). This rationale applies equally to the municipal taxpayer challenge in this case. *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991). The families' injury is not actual or imminent because it is unclear whether San Diego is expending tax dollars to support the leased property.

The leases are more reasonably characterized as a potential loss of municipal revenues, but even this loss is not particularized enough to create standing. There is no evidence that, if the leases were invalidated, the City would use the land to generate revenue. *See id.* at 1862 (finding the plaintiff taxpayers' alleged injury too conjectural because it depended on legislators' responses to the tax breaks). The City's Director of Real Estate testified that "[t]he City would likely seek another lessee to operate a recreational facility . . . under similar terms and conditions in the existing . . . lease . . . [because the] City Council has never had a policy of using the . . . property in a manner that maximizes the revenue that potentially could be generated by this site." [SER 4 ¶ 12.) Thus, the families have not suffered an injury to their pocketbook, as is necessary for taxpayer standing.

## IV.    Explanation of Certification

### 1.    The Need to Avoid Federal Constitutional Questions

We are bound to resolve the families' state constitutional claims before reaching their federal constitutional challenges. *See Kuba v. 1-A Agric. Assoc.*, 387 F.3d 850, 856 (9th Cir. 2004). If the California Constitution provides an independent basis for relief, then there is "no need for decision of the federal issue." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 295 (1982). Yet any interpretation by this court of

the State's constitutional clauses, unlike an interpretation by the California Supreme Court, cannot be authoritative. *See Bartoni-Corsi Produce, Inc. v. Wells Fargo Bank, N.A.*, 130 F.3d 857, 861 (9th Cir. 1997).

## 2.   The Need for Certification

We certify three issues to the California Supreme Court because they require interpretation of the state constitution's religion clauses beyond that found in state or federal cases. These clauses affect the delicate relationship between the government and religion, and any interpretation of these clauses has significant public policy ramifications.

### a.   The No Preference Clause

The No Preference Clause states in part that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. art. 1 § 4. The California Supreme Court "has never had occasion to definitively construe" this clause. *E. Bay Asian Local Dev. Corp. v. California*, 24 Cal. 4th 693, 719 (2000). Having not yet been faced with a case that requires it "to declare the scope and proper interpretation" of the clause, it has found no necessity to set the boundaries of the Clause. *See Catholic Charities of Sacramento, Inc. v. Super. Ct.*, 32 Cal. 4th 527, 562 (2004). We therefore cannot accurately estimate from existing California Supreme Court cases how that Court would apply the No Preference Clause to the case before us. Nor can we with confidence look to federal caselaw interpreting the federal Free Exercise or Establishment Clauses, because those provisions are narrower than California's clause. *See Sands v. Morongo Unified Sch. Dist.* 53 Cal. 3d 863, 910 (1991) (Mosk, J., concurring) (stating that the No Preference Clause "is without parallel in the federal Constitution"); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1395 (9th Cir. 1994) (noting that the California Constitution "prohibits any appearance that the government has allied itself with one specific religion" and

that California courts have interpreted the No Preference Clause "as being broader than the Establishment Clause of the First Amendment").

Although state intermediate appellate courts have construed the No Preference Clause, this case's unique facts would require us to go beyond these decisions. *See, e.g.*, *Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.*, 218 Cal. App. 3d 79, 93-95 (1990); *Okrand v. City of Los Angeles*, 207 Cal. App. 3d 566, 571-72 (1989); *Bennett v. Livermore Unified Sch. Dist.*, 193 Cal. App. 3d 1012, 1016 (1987); *Feminist Women's Health Ctr., Inc. v. Philibosian*, 157 Cal. App. 3d 1076, 1092 (1984). For example, the families challenge the process by which the leases were obtained, but no California court has identified the perspective from which we should scrutinize these processes to determine whether there has been a forbidden preference. The United States Supreme Court adopts the perspective of a reasonable observer when determining Establishment Clause questions, *see County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 635 (1989) (O'Connor, J., concurring in part and concurring in the judgment), but at least one Justice of the California Supreme Court has urged that courts interpreting the No Preference Clause "view the issue from the perspective of the minority," *see Sands*, 53 Cal. 3d at 915 (Arabian, J., concurring). Thus, we seek certification so that the California Supreme Court, rather than this federal court, can chart the proper course through these unresolved areas.

### b.   The No Aid Clause

No controlling precedent exists in regard to the No Aid Clause either. This Clause prohibits the City from "mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose." Cal. Const. art. XVI § 5. To assess whether the leases violate the No Aid Clause, we must determine whether the leases are aid and, if so, whether the

City supports a creed or sectarian purpose by granting the aid to the Boy Scouts. The California Supreme Court has not been called upon to define "aid" in a manner that applies to the circumstances of this case. Nor has it been required to establish what is a "creed" or "sectarian purpose" to which aid cannot be given.

The facts of this case also require us to go beyond the framework set forth in our own decision of *Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002) (en banc), for interpreting the No Aid Clause. *Paulson* concerned a No Aid Clause challenge to a municipal government's sale of public land containing a cross to a sectarian organization. *Paulson* concluded that the No Aid Clause "prohibits the government from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental." *Id.* at 1131. Whether the City granted a benefit to the Scout defendants for the advancement of a creed or sectarian purpose is a very different and more challenging question than that presented in *Paulson*. Resolution of this issue would require expanding our interpretation of California cases. An expansion or contraction of the definitions of "aid," "creed," or "sectarian purpose" could have a substantial impact upon Californians' liberties. We are reluctant to embark on a refinement of the meaning of those terms without the authoritative assistance of the California Supreme Court. We thus ask that Court to exercise its discretion and decide whether the leases are aid and whether this aid benefits a creed or sectarian purpose.

## V.    Administrative Information

The names and addresses of counsel for Lori, Lynn, and Mitchell Barnes-Wallace and Michael, Valerie, and Maxwell Breen are:

David Blair-Loy
Elvira Cacciavillani
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131

Mark W. Danis
Morrison & Foerester, LLP
12531 High Bluff Drive Suite 100
San Diego, CA 92130-2040

M. E. Stephens
Stock Stephens, LLP
110 West C Street Suite 1810
San Diego, CA 92101

The names and addresses of counsel for Boy Scouts of America and the Desert Pacific Council, Boy Scouts of America are:

George A. Davidson
Carla A. Kerr
Hughes, Hubbard & Reed
1 Battery Park Plaza
New York, NY 10004

Charles Avrith
Alicia Mew
Hughes, Hubbard & Reed
350 S. Grand Ave. 36th Floor
Los Angeles, CA 90071-3442

Scott H. Christensen
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006-5040

As required by California Rules of Court 29.8(c) and (d), the Clerk of this Court shall submit copies of all relevant

briefs and an original and ten (10) copies of this Order to the Supreme Court of California with a certificate of service on the parties.

## VI. Stay and Withdrawal from Submission

All further proceedings in this case in this court are stayed pending final action by the California Supreme Court.

This case is withdrawn from submission until further order of this court. The parties shall notify the Clerk of this Court within one week after the California Supreme Court accepts or rejects certification, and again within one week if that Court renders an opinion.

---

KLEINFELD, Circuit Judge:

I respectfully dissent from the portion of the order concluding that the plaintiffs have standing under Article III. Because the plaintiffs lack standing, the case should be dismissed. However, assuming that there is standing, I concur in the portions of the order certifying questions to the Supreme Court of California.

The reason that the plaintiffs lack standing to sue the City and the Boy Scouts is that their only claimed harm from the Boy Scouts' religiosity is that it offends them. Neither they nor their sons have ever sought to join the Boy Scouts or use the facilities managed by the Boy Scouts. Although the plaintiffs are offended that, at some times of the year, a lot of (presumably reverent) Boy Scouts will be there, plaintiffs do not claim that they have ever been excluded, nor even that they want to camp at the same place, or camp at all. If the Boy Scouts were a church (which they are not), plaintiffs would be like someone offended because it was harder to get reservations at a hotel that hosts the church group's annual conven-

tion, even though (1) they could have still made reservations, and (2) they did not want to stay at a hotel that hosted the church group.

The complaint avers that the lesbian plaintiffs "refuse" to participate in Boy Scouts and "will not permit" their son to participate because of what they understand to be the Scouts' views on sex. The same is true of the agnostic plaintiffs on account of the Scouts' views on God. They do not say that they or their son has been or will be barred from use of the San Diego facilities at issue. They allege no concrete personal injury[1] to themselves at all, beyond the offense to their sentiments. In their declaration, the plaintiffs say they "avoid" the Boy Scout area of Balboa Park because they "feel a strong aversion" to it. What plaintiffs do not say is that they ever tried to get reservations in the Boy Scout area of the park, or that they ever even wanted to. Rather, they "refuse to apply for use of the property" because they "feel degraded."

The closest plaintiffs get to claiming any "concrete injury" to themselves is suggesting that what they feel "degraded" by is that the Boy Scouts block out some time for Boy Scout activities, and that their reservations would have to be scheduled around Boy Scout reservations. But they do not claim that they have ever tried to make reservations, or ever would try to make reservations in the areas to which they "feel a strong aversion," or that, if they did they try, they could not get such reservations.

In their declaration, the lesbian plaintiffs say "we would not even contemplate affiliating ourselves with the Scouts, just as a Jewish person would not affiliate with a neo-Nazi group." There is nothing neo-Nazi about the Boy Scouts. Most Jews would also decline to affiliate with a perfectly well behaved

---

[1]*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[P]laintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is . . . concrete and particularized . . . .").

Episcopalian church, Democrats would decline to affiliate with the Republican Club and Republicans would decline to affiliate with the Democratic Club. Not wanting to affiliate does not imply that the group has harmed any legally protected interest of those who decline to join or be around them.

Likewise, the agnostic parents "purposely avoid" the Boy Scout area, but do not claim that they are excluded by anything but their own feelings. They claim that they would like to have their daughter participate in aquatic programs "but . . . object to having them exposed to the Boy Scouts' religious tenets and activities." They too allege no "concrete injury" beyond the one to their feelings. They claim that their use is "inferior" because the Boy Scouts have the "role of gatekeeper." That would matter, if they sought to get through the gate. But they do not allege that they ever have or ever would try to pass through the gate, or that the Boy Scouts would keep them out if they did. They do not say that they could not sign their daughter up, just that they don't want to because she would be exposed to Boy Scout thinking.

The lesbian and agnostic plaintiffs' declarations establish that they have strong negative feelings about the Boy Scouts. But feelings do not confer standing.[2] Federal courts have no judicial power in the absence of a "case or controversy,"[3]

---

[2]*See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 209 225 (1974) ("We have no doubt about the sincerity of respondents' stated objectives and the depth of their commitment to them. But the essence of standing 'is not a question of motivation but of the possession of the requisite . . . interest that is, or is threatened to be, injured by the unconstitutional conduct.' ") (quoting *Doremus v. Board of Education*, 342 U.S. 429, 435 (1952)). *See also Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 486 (1982)(" '[T]hat concrete adverseness which sharpens the presentation of issues,' *Baker v. Carr*, 369 U.S. 186, 204 (1962), is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.")

[3]*See* U.S. Const., art. III, §2, cl. 1.

which does not exist unless the plaintiffs have "standing."[4] And standing requires a "concrete injury,"[5] which must be "actual or imminent, not conjectural or hypothetical."[6]

This case is much like *Valley Forge Christian College v. Americans United for the Separation of Church and State,*[7] in that the plaintiffs have not established a concrete injury. In *Valley Forge*, the federal government had given away public land to a church college, treating the public benefit of the church college as a 100% setoff to the property's appraised value.[8] The plaintiffs, who did not share the religious views of the church, objected.[9] After disposing of plaintiffs' claim to have standing as taxpayers,[10] the Court went on to address plaintiffs' claim to have standing because of the injury to the plaintiffs' right to have the government refrain from violating the Establishment Clause.[11] In the course of rejecting this claim, the Court squarely rejected the sufficiency of "psychological injury" of the sort claimed by the plaintiffs in the case at bar:

> They fail to identify any personal injury suffered by them as a *consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with

---

[4]*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).

[5]*Baranowicz v. Commisioner of Internal Revenue*, 432 F.3d 972, 973 (9th Cir. 2005) (quoting *Knisley v. Network Associates, Inc.*, 312 F.3d 1123, 1126 (9th Cir. 2002)(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))).

[6]*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).

[7]*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464 (1982).

[8]*Id.* at 467-68.

[9]*Id.* at 469.

[10]*Id.* at 482.

[11]*Id.* at 482-487.

which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. . . . [S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy.[12]

We are bound by the Supreme Court's holding in *Valley Forge* that psychological injury of this sort is insufficiently concrete to confer standing.

The way that the plaintiffs establish standing to the majority's satisfaction is by showing that if they wanted access to the Boy Scout areas of Balboa Park, they would be subject to priorities in favor of the Boy Scouts.[13] This is not a persuasive position factually, at least on the record before us. True, as the majority says, the Boy Scouts have management offices at the park. But management and maintenance buildings would be closed to the general public no matter who did the management. True, as the majority says, the Boy Scouts block out reservations for certain times. But the record establishes that non-Boy Scouts can use the park even at those times. The pool is occasionally blocked off, but every public pool is unavailable to all the people some of the time, and some of the people all the time, as during girls' swim, boys' swim, adult swim, physical rehabilitation swim, town swimming lessons, and "everybody out of the pool" time.

For purposes of argument, though, let us assume that during certain desirable times, no one but Boy Scouts can use at least some of the facilities. According to the record, even during the Boy Scouts' special camping periods or swim periods,

---

[12]*Id.* at 485-86. The Supreme Court so concluded despite the fact that some of the plaintiffs lived near the college. It noted that proximity was not "sufficient to establish that [a plaintiff] has suffered, or is threatened with, an injury other than their belief that the transfer violated the Constitution. *See id.* at 487, n.23.

[13]Order 19472-74.

portions of the facilities are blocked from Boy Scout use and reserved for the general public, although the pool becomes unavailable at times. The most that the plaintiffs complain of is that *if* they wanted to go to the Boy Scouts area or the pool, they could not do so on equal terms with the Boy Scouts. But they do not want to go to these places. If the Boy Scouts really do exclude non-Scouts at desirable times, there ought to be some potential palintiffs who have been excluded or would be if they tried to get in, and would therefore have suffered concrete injury from the Boy Scouts' gatekeeping role. These plaintiffs are not among them.

These plaintiffs have never tried, and do not want to try, to use the facilities so long as the Boy Scouts are there. They find the Boy Scout area "offensive," "stressful," and "not a safe place." They do not, and would not, go to the pool, because they don't want their children "exposed to the Boy Scouts' religious views." They concede that "[e]ven if the City put on a . . . program there, [they] wouldn't send their children." The consequence of the Boy Scouts' presence is not that the plaintiffs cannot go there, but rather that they do not want to. That is precisely the psychological harm that *Valley Forge* holds is inadequate to establish standing.

Though unequal treatment is an injury,[14] standing requires a *concrete* injury *to the challenger*. That means not only that there is unequal treatment, but also that the unequal treatment affects the challenger. The plaintiffs' declarations do not establish that they have been or would be victimized by the alleged inequality. I do not think that the record establishes concrete unequal treatment, because the Boy Scouts assiduously avoid excluding non-Scouts even during peak Scout times (except for the swimming pool for three weeks). The plaintiffs allegations to the contrary are "no more than an

---

[14]Order 19474 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 666 (1993)).

ingenious academic exercise in the conceivable."[15] In essence, their argument is an argument contrary to fact: *if* they wanted to use the facilities that they do not want to use because they do not like being around the Boy Scouts, they *might* have to schedule their use of the park around the Boy Scouts' times, *if* the Boy Scouts' reservation priority made space unavailable, which it doesn't.

It is not a concrete harm that someone else gets to go first if the plaintiff does not want to go at all. "The federal courts were simply not constituted as ombudsmen of the general welfare."[16] For us to have a "case or controversy," a *sine qua non* of our power to do anything about a wrong, the plaintiff must suffer a "concrete injury" on account of the wrong. Inequality in making campground reservations and in gaining access to a pool does not injure someone who does not want to camp or swim there because of the unpleasantness of being in the presence of people with contrary beliefs about sex or God. The plaintiffs' injury, that if they wanted to use the Boy Scout area they would have to do so on unequal terms, is too "conjectural or hypothetical" to confer standing.[17]

These plaintiffs complain about not wanting to go to a place where the Boy Scouts are, not about being unable to get in. In the cases of ours involving crosses on public land that the majority cites, the plaintiffs actually would visit and drive in locations but for the religious symbols.[18] Here, the most the

---

[15]*United States v. S.C.R.A.P*, 412 U.S. 669, 688 (1972).

[16]*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 487 (1982).

[17]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992) ("[P]laintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is . . . actual or imminent, not conjectural or hypothetical.")(quotations omitted).

[18]*See Buono v. Norton*, 371 F.3d 543, 546-47 (9th Cir. 2004) (Plaintiff "regularly visits the Preserve" and "will tend to avoid Sunrise Rock on his visits as long as the cross remains standing, even though traveling [that way] is often the most convenient means of access to the Preserve."); *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993) ("[The plaintiffs] avoid two public parks in San Diego *which they would otherwise use*.")(emphasis added).

plaintiffs say is that if the Boy Scouts had different views, the plaintiffs would "like to be able to" camp in the Boy Scout area, not that they would; the declarations do not even claim that plaintiffs are campers (or swimmers). Lawyers write these affidavits carefully, so if the plaintiffs could truthfully say they would camp, not just that they would like to be able to camp, they would have said so.

Difficulty in getting a reservation at a hotel because of a convention is not a concrete injury to a person who does not want to be there because the guests at the convention are repulsive to him. For much the same reason, plaintiffs have not shown that they suffered or were in danger of imminently suffering a concrete injury.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.